OF THE

# STATE OF MISSOURI

AT THE

## APRIL TERM, 1906.

---

*(Continued from Volume 195.)*

---

### EVANS, Appellant, v. EVANS et al.

**Division One, April 20, 1906.**

1. CONFIDENTIAL RELATIONS: Fair Dealings: Burden. Business dealings between a physician and his patient, an attorney and his client, a pastor and his parishioner, a guardian and his ward, a principal and his agent, and between others holding like trusts or confidential relations, will be keenly scrutinized to prevent such relation being used as an instrument of extortion, speculation or other unfair advantage. When such relation is shown to exist at a time a given contract is entered into between them, the burden is upon the party holding the position of confidential adviser or of trust to show the contract to be reasonable and just.

2. ———: ———: ———: After Relation is Severed. Even after the confidential relation has been technically dissolved, dealings shortly thereafter born as an echo out of the old relation, are often subjected to the same scrutiny, and cast the burden on the party who disavows the relation existed at the time the contract was made to show that it no longer existed as an operative force.

3. ———: ———: ———: Not an Operative Force. In either case, though the confidential or trust relation may have existed, it may be shown that the relation was not the procuring cause of the contract.

196 Sup—1] (1)

4. ——: ——: ——: ——: Relation Dissolved: Specific
Performance: Estoppel: Facts in Evidence. Plaintiff's brother
died in Missouri leaving a large estate which he had conveyed
to his childless wife. Plaintiff and his sister lived in Wales,
and his two nephews, the defendants, lived in New York and
were waiters in restaurants, and had never seen the land, nor
the plaintiff but once. He came to America, and, aided by coun-
sel and powers of attorney from defendants and his sister, ef-
fected a settlement with his brother's widow, by which she
deeded to a trustee for the benefit of himself, the sister and
defendants, several tracts of land and other property. They
made him their agent to sell, manage and control the property,
and he kept an account wherein he charged for his expenses
and services. Not being able to sell, and differences arising be-
tween them, he instituted partition suit, and defendants, after
consulting with counsel in New York, employed Missouri law-
yers who had been employed by the sister. They set up in their
answer a charge that plaintiff had collected and improperly re-
tained over $6,000, and in reply plaintiff averred that he was
justly entitled to a larger sum, mentioning the items. A vol-
uminous correspondence was carried on between plaintiff and
defendants, in which plaintiff complained bitterly of defendants'
counsel, and charged the delay of the suit and his inability to
sell to their interference and the interference of his sister's son,
who lived close by the property. Both parties were anxious
to sell and realize cash. Plaintiff in writing offered defendants
$2,000 for their interests, which offer was referred to their New
York counsel, who in turn referred it to their Missouri attor-
neys, who advised its rejection. Several months passed, and
both plaintiff and defendants were vexed at the delay in real-
izing cash. Thereupon, plaintiff, while the partition suit was
pending, represented to them that their interests, after deduct-
ing his expenses and outlays and considering the state of the
market, were worth not to exceed $2,700, and offered them
$2,600, and without consulting anyone, they entered into a writ-
ten contract to sell, and this contract plaintiff seeks to have en-
forced, and defendants contend that plaintiff was their agent
and by misrepresentations he secured a contract to buy for $2,-
600 property worth $5,200. After the contract was made, and
before the partition suit was tried, defendants telegraphed their
Missouri attorneys to disregard the contract, and at the trial
the plaintiff's claim for services and expenses was settled by
stipulation, and plaintiff claims that, without knowing that de-
fendants had repudiated their contract, he was induced to for-
bear and waive a part of his claim. *Held*, first, that the rela-
tion of principal and agent had been dissolved; second, the con-
tract must be enforced; and, third, defendants are estopped by
the stipulation in the partition suit to dispute the contract.

5. **SPECIFIC PERFORMANCE: Inequitable Contract: Duty of Courts.** Within the bounds of judicial discretion a court of equity will not enforce a hard or unconscionable contract, whether or no. On the other hand, courts are not created to lay a judicial ax at the root of contracts entered into by those *sui juris* and pertaining to a subject-matter not contrary to good morals. The prime function of courts is to enforce the written law and written contracts—a contract being, as between the parties, but a law unto themselves.

6. ———: **Estoppel: Settlement of Partition Suit.** Where plaintiff, in reliance upon the validity of a contract to purchase the interest of some of the defendants in the land then in partition, was induced thereby to forego a part of his claim for expenses and services in managing the estate, defendants will be estopped to repudiate the contract on the ground of misrepresentations, if they at the time had notified their counsel to disregard the contract of sale, and counsel arranged a settlement of plaintiff's claim without making known to him that the contract had been repudiated.

7. ———: **Terms of Performance: Contract for Net Sum: Taxes and Costs: Trustee's and Attorney's Fees.** Where the contract sought to be enforced calls for a net sum of $2,600, and contemplates a partition suit with the usual incidents of costs, the seller must be relieved of the legal costs of the partition, however large they may be, and of taxes and collateral inheritance taxes, and of trustee's fees where the property is held by a trustee, but not of trustee's fees and fees of attorneys accruing since the contract was repudiated. But where the seller's attorney's fees in the partition suit were taxed as costs against the subject-matter of the contract, and the correspondence between the seller and purchaser reveals a contemporaneous construction of the contract to the effect that the seller was to pay those fees, the purchase price should be reduced by that amount, though the contract called for a net sum.

8. ———: ———: **Rents and Interest.** Where the contract of purchase is decreed specifically performed, the income from the properties from the date of the contract belongs to the purchaser in possession. But where the purchaser did not pay the money into court or keep his tender good, he should be charged with six per cent interest.

Appeal from Cass Circuit Court.—*Hon. Wm. L. Jarrott,* Judge.

REVERSED AND REMANDED (*with directions*).

*Givan & Glenn* and *Warner, Dean, McLeod, Holden & Timmonds* for appellant.

(1) The contract sued on was not procured by fraudulent misrepresentation of values. It was open and fair. (2) At the time of the making of the contract of sale defendants were not relying on the plaintiff. (3) Mere inadequacy of consideration constitutes no defense to a bill for specific performance. Harrison v. Town, 17 Mo. 237; Seymour v. Delaney, 3 Cowen 505; Osgood v. Franklin, 2 Johns. Ch. 124; Lee v. Kirby, 104 Mass. 424; Park v. Johnson, 4 Allen 266; Fry on Spec. Performance, sec. 280; Waterman v. Waterman, 27 Fed. 827; Chubb v. Beckham, 23 N. J. Eq. 207. (4) To entitle one to rescind a contract for fraud, he must promptly exercise his option upon discovery of the facts warranting a rescission. 14 Am. and Eng. Ency. Law (2 Ed.), 161; 24 Am. and Eng. Ency. Law (2 Ed.), 1111; Taylor v. Short, 107 Mo. 384; Lewis v. Land Co., 124 Mo. 673. And he must promptly announce to the other party his purpose. Delay will be held to be an affirmance. Grymes v. Sanders, 93 U. S. 55. (5) Not only must defendants have acted promptly, upon discovery of the alleged fraud, but they also should have placed plaintiff *in statu quo.* (6) By reason of the circumstances under which the stipulation and decree in partition were made, defendants are estopped from asking a cancellation of the contract. Bigelow on Estoppel (5 Ed.), p. 586; Chapman v. Chapman, 59 Pa. St. 214; Niven v. Belknap, 2 Johns. 588; Nicholas v. Austin, 82 Va. 817; Gill v. Hardin, 48 Ark. 409; Forbes v. McCoy, 24 Neb. 702; Gregg v. Von Phul, 1 Wall. 281; Wendell v. Van Rensslaer, 1 Johns. Ch. 344; Pelkington v. Ins. Co., 55 Mo. 178; Irvine v. Scott, 86 Ky. 260; Iron Co. v. Trout, 83 Va. 397; Weinstein v. Bank, 69 Tex. 38; Bank v. Miller, 153 Ill. 244; Guffey v. O'Reiley, 88 Mo. 429.

*Perry S. Rader* and *Ed. E. Yates* for respondents.

(1) "Specific performance of a contract is not a matter of absolute right. It rests in the sound judicial discretion of the chancellor, and the granting or refusal of such relief must depend upon the facts and circumstances of each particular case." Davis v. Petty, 147 Mo. 383; Veth v. Gierth, 92 Mo. 97; Hollmann v. Conlon, 143 Mo. 378; Railroad v. Curtis, 154 Mo. 23; Shinkle v. Vickery, 156 Mo. 15; Paris v. Haley, 61 Mo. 453; Glass v. Rowe, 103 Mo. 513; Durretts v. Hook, 8 Mo. 374; Taylor v. Williams, 45 Mo. 80; Pomeroy v. Fullerton, 131 Mo. 581; Snell v. Mitchell, 65 Me. 48. The contract must be fair and just in all its parts. Goodlett v. Hansell, 66 Ala. 156; Andrews v. Andrews, 28 Ala. 440; Rust v. Conrad, 47 Mich. 454; Crane v. Decamp, 21 N. J. Eq. 418; Cathcart v. Robinson, 30 U. S. 276. (2) The relation between agent and principal, uncle and nephew, is confidential, and when a contract has been obtained by that agent and uncle from the principal and nephew, by misrepresentations as to the value of the subject-matter of the contract, the contract is fraudulent, and being executory will not be specifically enforced by a court of equity. McClure v. Lewis, 72 Mo. 322; Martin v. Baker, 135 Mo. 503; Kirschner v. Kirschner, 113 Mo. 296; Barrett v. Ball, 101 Mo. App. 288; Gotschalk v. Kircher, 109 Mo. 184; Fish v. Lisen, 69 Ill. 394; Leavitt v. Laforce, 71 Mo. 354; Fry on Specific Performance, secs. 420, 664, 672, 674, 677; Dunne v. English, L. R. 18 Eq. 524; Cheney v. Gleason, 125 Mass. 166; Tucke v. Buchholz, 43 Iowa 415. Where the owner is ignorant of the value of the property and no relation of agency exists between him and the purchaser, misrepresentations as to the value by the purchaser will alone defeat specific performance. Powers v. Hale, 25 N. H. 145; Merritt v. Wassenich, 49 Fed. 785; Race v. Weston, 86 Ill. 91; Kelly v. Sheldon, 8 Wis. 258; Clinkenbeard v. Weather-

man, 157 Mo. 106. An agent who buys from his principal occupies a relation of trust and confidence with that principal, and the burden is on him to show that he made a full disclosure to the principal of all he knew respecting the property and its value, and that the price to be paid was fair and just. Bigelow on Fraud, pp. 295, 299; Cheney v. Gleason, 125 Mass. 166; Tucke v. Buchholz, 43 Iowa 415; Murdock v. Milner, 84 Mo. 96; Euneau v. Rieger, 105 Mo. 659; Midlicott v. O'Donel, 1 Ball & B. 164; Ingle v. Hartman, 37 Iowa 274; Ferguson v. Dent, 24 Fed. 412; Jansen v. Williams, 36 Neb. 869; German Sav. & Loan Soc. v. De-Lashmutt, 83 Fed. 33; Ralston v. Turpin, 129 U. S. 674; McHenry v. Irvin's Exrs., 85 Ky. 342; Taylor v. Sanborn, 128 Ill. 136; Rochester v. Lovering, 104 Ind. 568; Stewart v. Mather, 32 Wis. 345; Nesbit v. Lockman, 34 N. Y. 169; 1 Clark & Sykles on Law of Agency, p. 927, sec. 413; Norris v. Tayloe, 49 Ill. 17; Prince v. Dupuy, 163 Ill. 417; Pomeroy on Specific Performance, sec. 196. (3) The plaintiff is not entitled to a decree of specific performance because in his petition he sets up a claim for $400 attorney's fees and $300 costs in the partition suit and for the inheritance tax, all of which he alleges are liens on defendants' interests in the estate, and asks that those sums be deducted from the promised payment of $2,600, and that upon the payment of "the balance of said sum" a "specific performance of said contract be decreed," whereas, nothing is said in the contract about the obligation of defendants to pay those sums. The petition, therefore, seeks to enlarge, and asks for specific performance on terms not authorized by, the contract made the basis of his action. Johnson v. Fecht, 185 Mo. 347; Secret Service Co. v. Mfg. Co., 125 Mo. 156; Isaacs v. Shrainka, 95 Mo. 517; Green v. Cole, 103 Mo. 70. "If the party seeking a specific performance has disregarded the reciprocal obligations on his part, equity will not interfere at his instance." Louthan v. Still-

well, 73 Mo. 498. "The contract must be enforced as a whole, if at all." Hill v. Min. Co., 119 Mo. 9. (4) The contract is void for lack of consideration. Plaintiff paid nothing for it, and has done nothing under it. It does not express any consideration or purport to be based on any consideration of any kind. Davis v. Petty, 147 Mo. 382; Bosley v. Bosley, 85 Mo. App. 424; Tucker v. Bartle, 85 Mo. 120; Short v. Price, 17 Tex. 397; Tumlinson v. York, 20 Tex. 694. (5) The contract is not enforcible for lack of mutuality. It was not signed by plaintiff. It bound him to do nothing, he has done nothing under it, and he has never accepted it. Davis v. Petty, 147 Mo. 374; Hollmann v. Conlon, 143 Mo. 369; Fry on Specific Performance (3 Am. Ed.), sec. 1073; Glass v. Rowe, 103 Mo. 513. Even if those cases which hold that the party who has not signed the contract can, by bringing his suit for specific performance, declare his acceptance of it, and thereby supply its lack of mutuality, were followed, still the lack of mutuality remains in this case, for plaintiff does not unequivocally declare on that contract. He does not by his bill tender the $2,600 to plaintiffs. He simply brings said $2,600 into court and only "offers to pay same to defendants . . . upon the payment by said defendants . . . of the costs and charges hereinbefore referred to." That is not an acceptance of the contract. That is no such tender as the law requires. Short v. Kieffer, 142 Ill. 258; Deichmann v. Deichmann, 49 Mo. 107. "The purchaser's offer to pay a less amount than what was due was equivalent to a refusal to pay the full sum due." Hollmann v. Conlon, 143 Mo. 381.

LAMM, J.—On the 23d of October, 1899, Thomas D. Evans, then childless, died a resident of Cass county, Missouri, full of years and infirmities of mind and body, having shortly theretofore conveyed a considerable estate to his wife. By inference, he was a Welshman — at any rate, he left surviving him a brother,

D. J. Evans (appellant here), and a sister, Mary Thomas, residents of Wales, and two nephews, Daniel and Charles William Evans (respondents here), sons of a deceased brother, residents of the city of New York. Daniel Evans was thirty-one years of age and married; Charles William was twenty-nine years of age and single, and they are spoken of both as *chefs* and as waiters, but the substantial evidence points to their business occupation as that of cafe waiters.

In November, 1899, D. J. Evans left Wales and came to Cass county to investigate his deceased brother's affairs. Up to that time he never had seen his nephews, Charles William and Daniel, except once in Paris, and had held no communication with them whatever, and while an extensive correspondence occurred subsequently, yet he never met them but once during its existence. We infer his American trip was the result of consultation with his sister, Mary Thomas. On his coming upon the ground, such a situation presented itself as led him to solicit and procure a power of attorney from his said nephews and sister to represent them as heirs at law of Thomas D. Evans in and about obtaining their rights as such. The terms of this power of attorney are not shown, but the matter is dealt with throughout as though it was a full power of attorney and vested him with large discretion. In pursuance of such power, and acting for himself and his principals therein, he utilized the information already gathered by him tending to show undue influence and mental incapacity, and other knowledge afterwards obtained, in challeging the validity of the conveyance made by his brother to his wife and thereby, with the assistance of attorneys in Kansas City and Harrisonville, he obtained a settlement with the widow out of court, whereby a tract of land in Texas, several farms in Cass county, and 85 shares of the capital stock of the Harrisonville Hotel Company of Harrisonville, Missouri, were transferred to him, together with $1,000 in cash,

about the middle of January, 1900, in full acquittance of the claims presented and represented by him. The hotel corporation aforesaid was capitalized at $38,000, divided into shares of stock of the par value of $100 each, but of an inconsiderable and uncertain actual value.

Being an alien, it seems a question was sprung about his right to take and hold title to real estate, and thereupon the title was put in one Davis, and by Davis it was transferred to the Fidelity Trust Company, a Missouri corporation (also a respondent here) in trust.

Mary Thomas had a son, William, residing in Cass county or in Kansas City, and it shortly befell that friction arose between William Thomas and his uncle about the management of the estate, and they began to eye each other with distrust, but the merits of this particular family controversy do not appear material to the present litigation, further than to say that while full details are not in the record, yet it is apparent that William Thomas put himself in communication directly and indirectly, through his attorneys in Kansas City, with Daniel and Charles William Evans and with his mother in Wales, and that it presently resulted that Mary Thomas placed the management of her interests in her son William's hands or in the hands of attorneys in Kansas City, and D. J. Evans ceased to represent his sister as attorney in fact. The exact date D. J. Evans ceased to act as agent for Mary Thomas does not appear, but it was some time during the year 1900, and possibly during the summer or autumn.

During the time he was clothed with full power as agent, he made disbursements in repairs, taxes, attorneys' fees, for abstracts and personal expenses in a large aggregate sum and incurred other outlays in advertising and in attempting to sell the property recovered by him from the widow of Thomas D. Evans— the policy of all parties getting this windfall being to

close their shares out for cash as speedily as might be. The market value for real estate was dull during 1900 and it seems that he was able to dispose of only the Texas tract, of small extent and value, and another small tract for a small sum. When things were in this fix and after his right to manage the estate on the part of his sister Mary had been taken from him, he found that through the instigation and at the initiative of William Thomas a partition suit was about to be instituted to partition the estate held by the Fidelity Trust Company in trust for himself, Mary Thomas and his two nephews. Thereupon he, *se defendendo*, employed a firm of attorneys in Kansas City to institute a partition suit in the circuit court of Cass county on his own behalf, which was done to the January term, 1901, making Mary Thomas and his two nephews and the Fidelity Trust Company defendants.

Pending this partition suit, and evidently against his wish, his nephews, acting through their attorneys in New York, employed one of the same attorneys to represent them that Mary Thomas had employed. It seems one of the Kansas City counsel for Mary Thomas had apparently assumed a position somewhat antagonistic to D. J. Evans and it seems that his employment took on a bit of color from that antagonism. At all events, he required a free hand and unquestioned authority as a militant lawyer in a militant case and exacted and received a written power of attorney to represent Daniel and Charles William Evans, as follows:

"We hereby retain you as our attorney and counsel in the above-entitled case, and authorize you to appear for us and each of us therein to file answer for us and take such steps and proceedings as in your judgment may seem proper to protect our interests in the above case until it is finally disposed of.

"DANIEL EVANS,
"CHARLES WILLIAM EVANS."

Thereafter counsel entered the appearance of their clients and filed a joint answer for Mary Thomas and Daniel and Charles William Evans during the May term, 1901. It is somewhat significant that this answer challenges the business management by D. J. Evans of the estate of his principals, alleges that he had collected and had on hand over $6,000 which he should disgorge, and asks his accounts to be examined and two-thirds of that sum charged against his individual interest for the benefit of his cotenants. Thereafter at the September term, 1901, of said circuit court, D. J. Evans filed a reply, setting forth matter justifying, if true, his acts and management under his power of attorney, and, furthermore, made an exhibition of his disbursements for and on behalf of the trust estate and pursuant to the powers given him in his warrant of attorney, together with claims for his personal services and expenditures in recovering, bettering, managing and trying to dispose of the estate, aggregating over $7,500.

Also pending this litigation, D. J. Evans made a proposal to buy the interest of his nephews for $2,000, and we think this offer was made shortly before the aforesaid answer was filed. This proposal was submitted by them to their New York attorneys and by said New York attorneys to their attorneys in Kansas City for investigation and report, and D. J. Evans was notified of that fact. Subsequently, on an adverse report from their attorney in Kansas City, the proposition was declined and, as near as we can ascertain from the record, the said joint answer of Mary Thomas and Daniel and Charles William Evans was presently filed in the partition suit. Some months thereafter, to-wit, on September 27, 1901, D. J. Evans submitted another proposition to his nephews to buy their interests for $2,600; and, as a result of letters passing to and fro, thereafter, on a date somewhat uncertain, but, as we infer, on October 11, 1901, the proposition was accepted

and a written contract, duly acknowledged by Daniel and Charles W. Evans, was entered into, as follows:

"This agreement, made and entered into this — day of October, 1901, by and between Daniel Evans and Charles William Evans, of the city of New York, State of New York, parties of the first part, hereinafter called the sellers, and Daniel J. Evans of the county of Jackson, State of Missouri, party of the second part, hereinafter called the buyer;

"Witnesseth, that the said sellers have bargained and sold to the buyer all of their undivided interest, being an undivided one-third interest in and to the following described real estate situate in the county of Cass, State of Missouri, to-wit:

"The southwest quarter of section thirty-five; the southwest quarter of the southwest quarter of section twenty-six; the east half of the northeast quarter of section thirty-four, except six acres off of the northwest corner lying west of Grand river; and the west half of the northwest quarter of section thirty-five, all in township forty-three, of range thirty-one; also the north half of the southeast quarter of section twenty-eight; the north seventeen and one-half acres of the southwest quarter of the southwest quarter of section twenty-seven; and five acres off of the south side of the northwest quarter of the southwest quarter of section twenty-seven, all in township forty-four, of range thirty-one. Also all of lot two of the northeast quarter of section three; thirty-six acres off of the west end of lot one of the northeast quarter of section three; and twenty acres off of the east end of lot one of the northwest quarter of section three, all in township forty-four, of range thirty-two; also part of lot thirteen, block five, in the original town of Harrisonville, Missouri, beginning at the northwest corner of said lot; thence south twenty-four feet, thence east eighty feet; thence north twenty-four feet, thence west eighty feet to the place of beginning.

Evans v. Evans.

"Also all their right, title and interest in and to any and all other property, real and personal, received by the said Daniel J. Evans, as their attorney in fact and agent, as their share of the estate of Thomas D. Evans of Harrisonville, Missouri, deceased, all at and for the price and sum of twenty-six hundred dollars, payable as hereinafter provided.

"Whereas, there is now pending in the circuit court of Cass county, Missouri, a suit brought by the said Daniel J. Evans against the said Daniel Evans, Charles William Evans and one Mary Thomas, since deceased, for the partition of the real estate hereinbefore described, which the said Daniel J. Evans is endeavoring to bring to a speedy termination.

"Now, therefore, it is agreed by and between the parties hereto that said purchase price of twenty-six hundred dollars hereinbefore provided to be paid to the said sellers by said buyer shall be paid as soon as said partition suit may be finally determined and in any event within six months from the date hereof. The said sellers agree concurrently with the payment of said purchase money to execute and deliver to said buyer a good and sufficient deed of general warranty, properly executed, conveying the fee simple title to one-third interest in said real estate and to execute and deliver such bills of sale, assignments or other conveyances as the buyer may require, to said property outside of said real estate in which said sellers are interested.

"Time is and shall be essence of this contract and the conveyance of said property as herein provided shall be consummated within six months of the date hereof.

"In witness whereof, the said parties have hereunto set their hands and seals the day and year first above written.

"CHAS. W. EVANS,  (Seal)
"DAN'L EVANS,  (Seal)."

This contract was made independently of their aggregation of counsel and without such counsel's knowledge or advice, but it was evidently made after full notice of the issues in the partition suit, as joined by their answer and their uncle's replication. It was made, too, after he had requested and urged them to come to Missouri and, on the ground, ascertain the true situation, values, claims pending, pro and con, and the danger of delays. It was apparently made by the nephews in a fit of pique over the delays in the partition suit and in disgust over their inability to realize present cash for their shares. We think the foregoing facts sufficiently appear by inference as well as by direct proof. However, shortly after making the contract they notified their attorneys of its existence, and some time thereafter, as the result of a letter from their Kansas City attorneys directed to their New York attorneys, they decided to repudiate the contract, and, on November 22, 1901, they notified their Kansas City counsel to that effect by the following telegram: "Proceed with trial Monday, as our attorney. Disregard contract with D. J. Evans, as same was obtained by misrepresentation. Letter follows."

This telegram was followed by a letter from their local counsel in New York, as follows:

"Dear Sir: In reply to your favor of the 18th instant, I would say that Mr. Daniel Evans is at the present time at my office and that he informs me that he and his brother desire you to prosecute with the greatest vigor the action now pending in which they sometime since sent you a retainer.

"Our clients have signed a contract with their uncle to accept $2,600, but this contract, I am informed, was obtained from them by means of misrepresentation practiced by their uncle and should he ever commence an action upon such contract our clients desire to fight him upon it, alleging its invalidity.

"At any rate, they do not yet seem to have trans-

ferred their interest to their uncle, either in the prop-
erty or in the action, and, therefore, they are in a posi-
tion to fight the present case in the courts.

"Kindly let me hear from you at the earliest possi-
ble moment as soon as there are any results.

"Mr. Daniel Evans says he wrote you some time
since asking you about the condition of the case, but
that you failed to reply to him. I remain, Yours
respectfully."

Notice of this somewhat belated intention to re-
scind was confessedly kept secret from D. J. Evans and
his attorneys. In ignorance thereof, they, after a pro-
longed negotiation with opposing counsel, consented to
a decree in partition five days later, which decree was
in pursuance of a compromise stipulation entered into
materially reducing the amount of D. J. Evans' assert-
ed demands against his cotenants, and which decree
was followed by a report of commissioners giving Dan-
iel and Charles William Evans a farm known as the
"Bridges farm," described as the southwest quarter
of section thirty-five, township forty-three, range
thirty-one, in the county of Cass in the State of Mis-
souri, and the eighty-five shares of hotel stock. The
report of the commissioners was confirmed on the 11th
day of January, 1902.

Thereafter, on his nephews being applied to for a
conveyance pursuant to the contract of purchase, D. J.
Evans for the first time learned they repudiated the
contract and denied its validity. Whereupon he insti-
tuted a suit for specific performance in the circuit court
of Cass county on March 6, 1902, making his nephews
and the Fidelity Trust Company defendants, and ten-
dering the contract price, asking, however, to have the
same reduced by the amount of a certain collateral in-
heritance tax, certain costs in the partition proceed-
ings, certain fees for defendants' attorneys in said
partition proceedings, which fees were charged against

defendants' interest in the land, and certain unknown demands of the Fidelity Trust Company based upon its claim for services as trustee.

To the bill thus lodged, Daniel and Charles William Evans filed an answer, denying some and admitting other allegations, and, by a way of cross-bill for affirmative relief, they averred in substance that they knew nothing of the value of their interest in Missouri; that D. J. Evans was their agent, their kinsman and adviser to whom they looked for counsel with reference to the management, control and disposition of their estate; that the said D. J. Evans advised them that their interest did not exceed $2,600, and that such representation was made to them for the purpose of cheating and defrauding them and to induce them to enter into a contract with him disposing of $5,200 worth of property for $2,600; that they relied on said representations, and, so relying, executed the contract in suit which they pray to have rescinded, and that title be vested in them, in accordance with the partition decree.

The Fidelity Trust Company filed an answer placing itself in a neutral position by asserting that it held title since the partition decree and is ready and willing to carry out the terms of its trust and of said decree, alleging, however, that there are $40 due it for its services and praying that the same be allowed, together with a reasonable attorney's fee in this proceeding, because, it says, that under its trust agreement it held title subject to such charges.

To the answer of Daniel and Charles William Evans, plaintiff filed a reply denying the averments of fraud and misrepresentation of the value of the property contracted to be conveyed, as alleged in the answer; and denying, furthermore, that Daniel and Charles William Evans looked to plaintiff for counsel and advice and relied upon statements and representations of this plaintiff leading up to the contract; and denying that his statements were false or were made

for the purpose of cheating or defrauding defendants.

Supplementing these denials the reply set forth the following affirmative averments:

"For further answer to said cross-petition plaintiff states that during the time of the negotiations which resulted in the contract, a copy of which is attached to the plaintiff's petition, and for a long time prior thereto, said defendants, Daniel Evans and Charles William Evans, had their regular attorney and counsel in Kansas City, Missouri, who advised them in regard to the management and disposition of their interests in the estate of Thomas D. Evans and that at the time that said contract was entered into and for some time prior thereto this plaintiff was not acting as the agent or adviser of said defendants, and that during the progress of the negotiations which resulted in said contract this plaintiff requested said defendants to come to the State of Missouri, for the purpose of personally inspecting said property, described in said contract and satisfying themselves as to its value; that said defendants stated that the land was of no use to them and that their object was to get the money for it at the earliest time possible and at the time that said contract was signed and for some time prior thereto said defendants were well informed as to the approximate value of their interest in the estate of the said Thomas D. Evans and had the advice and counsel of their attorney in regard thereto.

"Plaintiff further states that said sum of $2,600 was a fair price for the interest of said defendants in the estate of the said Thomas D. Evans at the time said contract was entered into.

"Plaintiff further alleges that at the time the stipulation above referred to was entered into and during all the negotiations between plaintiff and defendants resulting in the execution of said stipulation and the entry of the decree in said partition suit, the fact of the

existence of said contract was known and understood and its validity was not questioned by either party thereto and plaintiff was induced in reliance upon it to waive and forbear the prosecution in said partition suit of his claim for services and a large part of his claim for money advanced in behalf of defendants and to enter into said stipulation and agree to the entry of said decree, of all of which the defendants had knowledge; by reason whereof the plaintiff having in reliance upon said contract altered his position in said partition suit, says that defendants are now estopped to urge any invalidity in said contract or to object to performing the same.

"Wherefore plaintiff prays judgment as in his petition."

At a trial on issues thus roughly outlined, evidence was introduced establishing, not alone the facts hereinbefore stated, but uncovering other material facts presently to be stated in connection with a consideration of the issues involved. The chancellor entered a decree for defendants, rescinding the contract and vesting title in Daniel and Charles William Evans, from which decree plaintiff duly appealed.

Certain subsidiary questions are presented here, but the controlling questions are:

*First.* Whether a confidential relation existed between the uncle and his nephews at the time the contract was entered into, and, if so, has D. J. Evans successfully carried the burden placed upon him by the law (under such hypothesis) of showing the contract fair and equitable?

*Second.* Is there merit in appellant's contention that by concealing their intention to rescind, and by allowing appellant to proceed in the partition suit in ignorance thereof, they lost their right to a rescission and estopped themselves to challenge the validity of the contract?

(1) It is axiomatic in the law that business deal-

ings between a physician and his patient, an attorney
and his client, a pastor and his parishioner, a guardian
and his ward, a principal and his agent, and between
others holding like trust or confidential relations, will
be keenly scrutinized to prevent such relation being
used as an instrument of extortion, speculation, or
other unfair advantage. It is, furthermore, a truism
that when such relation is shown to exist at the time
of a given contract, the burden is placed upon the party
holding the position of confidential adviser or of trust
to show the contract to be reasonable and just. Cases
have arisen where, even after the relation has tech-
nically been severed, dealings shortly thereafter, or
which may have been born as an echo, so to speak, of
the old relation, somewhat come within the purview of
the proposition just laid down. It may be admitted,
also, that where such relation is proved to have existed,
the burden is cast upon the party who disavows the
relation at the time of a given transaction to show that
it no longer existed as an operative force but had come
to an end, or was in a condition of suspended animation.
Nevertheless, it must also be admitted, that such rela-
tion, once existing, may be shown not to have been the
procuring cause of a given contract. It may be shown
to have been inoperative at the time of such contract
and, further, the parties thereto may have placed them-
selves in such position as to indicate, for all the prac-
tical purposes of jurisprudence, that no confidence was
reposed and therefore none could be violated.

In the case at bar, it is contended by respondents'
counsel that on October 11, 1901, the date of the con-
tract sought to be specifically performed, D. J. Evans
was the kinsman and confidential adviser of Daniel and
Charles William Evans, his nephews, and that he
abused his position as such kinsman and confidential
adviser to procure an unconscionable contract. If this
contention be true, it needs no citation of authority to
show that a court of conscience will not and ought not

reach forth its arm to seize tainted and expectant gains and put them into his extended and itching palm. Equity will not decree inequity. But is it true? We think not; because it must not be forgotten that defendants had come to the maturity of full judgment and age and this in entire independence of their uncle — a stranger to them. Their relations to him were not the product of the magnetism of personal contact, of daily walk and conversation. To all intents and purposes such relations were dominated somewhat by temporary business ends and are to be gleaned in the lines and between the lines of a voluminous correspondence presented here, and in the power of attorney whose terms are not before us. From isolated passages in that correspondence, not necessary to quote, it is sought to be shown by respondents, in effect, that D. J. Evans tried to fence off his nephews from outside influences; from procuring fearless and competent counsel, to undermine the influence of such counsel, to throw dust in their eyes, and hold them within the radius of his own influence as agent and trusted kinsman for sinister purposes. But this correspondence must be judged of as a whole and be interpreted with delicacy and acumen according to recognized rules of interpretation. Referring to such rules, Dr. Lieber (see Lieber's Hermeneutics, p. 145), says:

"The only safe and just rule, for the interpretation and construction of private letters, is, that we discard everything which is not a bare statement of fact, or which does not carry along with it irresistible evidence of truth. Even the statement of facts ought to be given so as not to requre any completion, on the side of the receiver of the letter, such as the letter-writer knew would be added during the perusal by the person addressed. As to everything else, the language of a private letter is so entirely founded upon the relation between its writer and the receiver, their acquaintance with each other's character, use of words, nay, some-

times with the very accent with which the writer is in the habit of pronouncing certain sentiments or words, and upon a knowledge of so many details, which, though unmentioned, serve to give the right meaning to the words, that a letter, destined to remain private, frequently changes its whole character as soon as it is made public, and when a third person attempts to interpret whatever can be doubtful or ambiguous. The relation between two persons forms a key to their correspondence, for which nothing else can be substituted. There is a private *usus loquendi* between friends, husband and wife, members of a family, etc., which cannot be known by others.''

Judged by the foregoing rule, we cannot hold the letters of D. J. Evans satisfactory evidence showing the intent and purpose insisted upon by respondents. His letters to them and theirs to him show solicitude over delays, over costs accruing, over attorneys' fees piling up, over misunderstandings that had obtruded themselves, show assurances of esteem and of good family disposition, but they fall far short of establishing ulterior and reprehensible motives on the uncle's part. It seems all parties interested in the estate resided at a great distance. It is true Mary Thomas had a son on the ground, but at that time this son was only interested as an heir expectant, because his mother was alive. Living elsewhere, it was but natural that everyone should be bent on a quick realization in cash, so that they might go their ways, according to the even and usual tenor of their lives. So far as the record shows, every penny of this estate had been recovered by the diligence and enterprise of D. J. Evans — at the hazard of his own expense had he been unsuccessful. In trying to dispose of the estate and realize thereon, differences sprang up between him and his nephew, William Thomas. The state of his accounts was questioned, his expenditures were questioned and his management criticised and objected to. It resulted that

Mary Thomas sympathized with the views of her son and employed counsel to protect her interests. To this counsel, so employed, D. J. Evans, eight or nine months before his purchase, rendered a statement of his accounts and his estimate of the value of the lands and personal property of the estate. At an uncertain time, William Thomas came in touch with his cousins in New York and there is evidence indicating to our minds that Daniel and Charles William Evans became fully advised of the contentions and estimates of their uncle and of the contentions and estimates of Mary Thomas' attorneys and of William Thomas, her son. Armed with this information, when a partition suit resulted, they were not willing to trust their uncle's advice upon the question of the employment of attorneys, nor rely upon his estimates or accounts, but placed themselves in contact with their confidential legal advisers in New York City, who, as a matter of business wisdom, shrewdly selected the attorneys of Mary Thomas in Kansas City to make their defense to that partition suit, and to advise them about their rights, and we find they were fully advised thereon and were no longer *inops consilii*. On the advice of such counsel they rejected the first proposition their uncle made, and on the advice of such counsel they filed an answer sharply antagonizing their uncle's claims, and their defense was pressed with vigor. Vexing delays and uncertainties arose, when, finally, being hunger-bitten for their prize, they chose to avoid all chance of miscarriages and delays in litigation by getting what their hearts were set on, namely, a quick cash settlement — a bird in hand rather than one in the bush. Their uncle wanted to close the transaction and presumably go back to his own country. We cannot say he knew or supposed they would ignore their counsel in coming to an agreement with him. He knew they had counsel of their own choice, not of his. He knew such counsel had been consulted and were the moving cause in rejecting his former proposition. He

had the right to suppose the new proposition would pass under their trained legal eyes — eyes unfriendly to him. It happened it did not, but the blame for this omission should rest with the nephews, where it rightly belongs, and cannot be laid at his door, we think, under the record facts before us. Every tub should rest on its own bottom, as the proverb saith, and they had the right to weigh the matter in their own mind, without reference to counsel, if they saw fit so to do. Nor did he have reason to expect his nephews would rely upon his representations alone, armed as they were with the demands and counter-demands made in the litigation. In short, to our minds, the relation of principal and agent was practically suspended between D. J. Evans and his nephews at the time of the making of that contract and the parties were dealing at arm's-length with one another, precisely in the attitude their pleadings placed them in court, and with the power of attorney so much waste paper — dead as a factor in their present affairs, and we so hold.

(2) But it is said the contract is unjust and inequitable; that the interest of Daniel and Charles William Evans was, at a fair valuation, over $5,000 in round numbers, and that, therefore, a court of equity should not specifically enforce the contract. Of this contention it may be said in a general way, that, within the bounds of judicial discretion, a chancellor will not, whether or no, enforce a hard and unconscionable contract. On the other hand, courts were not created to lay a judicial ax at the root of contracts entered into by those who are *sui iuris* and pertaining to a subject-matter not *contra bonos mores*. The prime function of courts of justice is to enforce the written law and enforce established contracts — a contract being, as between the parties thereto, but a law unto themselves. We have critically examined the record facts to see whether the contract should be disturbed because unconscionable, and have come to the conclusion it cannot be

held subject to that vice. And this is so, because the proposition was a net sum, within certain limits hereinafter to be considered. In getting at that net sum, estimates were dealt in by the uncle and we cannot shut our eyes to the fact that his nephews were possessed of estimates from their own counsel and were possessed of facts upon which they could make estimates of their own. Some of the elements entering into these estimates created uncertainties and contingencies. What would be a net sum realized speedily by his nephews would depend upon the present market value of real estate and hotel stock. The year 1901 saw western Missouri faint with the scourge of an all-pervading and drastic drouth, resulting in depression. The net sum realized would depend also upon the adjustment of the claims presented by their uncle for outlays and services. The partition case proceeded on the theory the uncle was entitled to pay for his services and there is nothing to indicate to us those services were compressed into a short period of time or were small in degree. He was making his demands; his nephews knew of these demands; and he placed his estimate on their interests at about $2,700, after deducting his outlays and expenses and considering the present state of the market and the necessary costs in partition. Appellant introduced evidence from experts tending to show that his estimate of values was fair. On the other hand, respondents introduced evidence based on the judgment of experts tending to show that his estimates were too low. But all these estimates, at bottom, were mere opinions, after all, and that the figures had been threshed over in the minds of the nephews is apparent to us. Not only so, but they were invited to come upon the ground and view the situation with their own eyes, aided by consultation with their business advisers. It is urged by their learned counsel that they were mere waiters and ignorant of values, and that if they had come to Missouri they would have been unequal to the

task of successfully opposing their uninformed judgments to their uncle's better judgment, *ergo*, they did well to stay away. But this insistence leaves out of sight the fact that if they had come to Missouri they would have come in contact with their counsel—counsel looking on the uncle askance and well-equipped to guide the judgment of their clients, and the uncle knew that fact. So that, it seems to us their voluntary absence from the scene and their determination to deal with the matter at long range in New York must not be given a significance decisive of appellant's rights.

Without cumbering this opinion with the details of the evidence of the experts on values, we announce our conclusion to be that there is no such infirmity in the contract as justified the learned chancellor below, in refusing to enforce it.

(3) We now approach the question of estoppel lodged in the case by appellant's reply. And in this insistence we think there is merit. To understand it, it will be necessary to state a little more in detail some of the facts not hereinbefore uncovered. Those facts are as follows: While the title was in the Fidelity Trust Company in trust, that trustee advanced D. J. Evans $1,200. At the time this advancement was made, he had been subjected to personal expenses and outlays in and about the affairs of his principals in a dignified figure. His financial standing and ability to command cash are not disclosed here. Presumably, the advance was legitimate and within the purview of his rights and necessary in the recovery and conservation of the estate. When the trial in the partition suit was at hand, all the parties and their respective attorneys knew that the contract in suit was outstanding. But Daniel and Charles William Evans and their attorneys knew something the attorneys for D. J. Evans and D. J. Evans himself did not know, to-wit, that they did not intend to stand by their contract, and that the partition suit was to be an adversary proceeding, so far as they

were concerned, to be fought out to the bitter end. Respondents retained this important information to themselves. They are not subject to criticism for exercising a privilege of secrecy as a by-end, but the judicial mind, in according such privilege, will also be astute to find a way to prevent an unfair advantage resulting from that secrecy. Respondents' theory was that "it was only necessary to cross one bridge at a time." Their theory was that D. J. Evans would get their interests if he could enforce his contract in court; otherwise, not. In this situation of things, after a consultation lasting part of a day and far into the small hours of the night, and finally resumed in a side room at the courthouse when court convened the next day, a compromise was made in which D. J. Evans agreed, as we understand the record, to pay the $1,200 to which he had subjected the trust estate, and, as asserted by his counsel, did thereafter pay the same.

Furthermore, running through that consultation and leading up to that compromise, like a well-marked thread, is the fact that D. J. Evans, on the theory that he had bought his nephews' interest, was led to largely forego his claim for services. It seems he was willing to let the heirs of his sister Mary, then dead, have the advantage resulting from abating, to a degree, these demands, because, as purchaser from his nephews, he would receive back from them the benefit of one-third of these expenses thus remitted. In other words, if the expenses were divided into three equal parts, one part to be borne by Mary Thomas, one part by his nephews and one part by himself, and if he was the owner of his nephews' share and obliged to pay them a net sum, he would at the end only lose the one-third of the expenses properly chargeable to Mary Thomas. We are convinced this was a material, persuading cause in his agreeing to the compromise. The record to our mind clearly indicates, furthermore, that Daniel and Charles William Evans must be charged with notice of the fact,

through their representatives on the scene, that D. J. Evans was influenced by the foregoing consideration. Now, it is elementary law that one seeking rescission must move with reasonable speed after discovering facts, if any, warranting a rescission. It is elementary law, too, that one may not stand by in silence and see his opponent shift position or renounce his substantive rights on the theory a contract exists and afterwards seek to avoid the contract. That he who does not speak when he should, may not speak when he would, is a commonplace of the law of equitable estoppel. There went by at least five days before this compromise decree, and there went by thereafter nearly two months before the final confirmation of the report of the commissioners in partition under the decree based on that compromise, and yet appellant was only allowed, for the first time, to learn that his contract was repudiated at the end of that period. If that repudiation be allowed by the law, then his right to insist upon his nephews' bearing their full share of his expenses, etc., is irrevocably lost to him, and he is caught as with a gin by the heel.

It is our conclusion on this branch of the case that typical facts constituting a plain estoppel appear in this record. It is our conclusion, furthermore, that respondents did not move with the speed and fairness required of them to entitle them to a rescission and, therefore, we are of the opinion that the decree of the chancellor rescinding the contract ought not to stand, but that the doctrine of estoppel should be allowed full force in this controversy.

(4) But appellant does not construe the contract correctly. That contract provides for a net sum. It contemplated, furthermore, a partition, with the usual incidents of costs. It results that the nephews must be relieved from the legal costs of such partition, however large they be. The idea of a net sum also excludes taxes and the nephews must be relieved from all collateral

inheritance and other taxes accrued at the time of the partition.

The same theory of a net sum relieves the nephews from liability for trustee's fees, if any, accrued up to the date of the partition. Not so, however, for trustee's fees and fees for services of attorneys to such trustee accruing since the repudiation of the contract. All such fees should be borne by Daniel and Charles William Evans. And if any such exist, the contract price should be diminished thereby.

A rather anomalous condition of things presents itself relating to attorneys' fees for respondents' counsel for services rendered to defendants in the partition suit. It seems that in the partition decree, fees were allowed to defendants' counsel, and such fees were charged against the interests of all the defendants in that suit set off to them in partition. It is contended by appellant that the contract does not require him to pay such fees and in this contention we think he is right; because the contemporaneous construction placed on the contract by D. J. Evans and his nephews, as shown by the correspondence, was that the nephews should pay their own attorneys' fees. The net sum they were to receive was not understood by the parties to that contract to relieve the nephews from settling with their attorneys. It seems that the novel plan was hit upon of having these fees taxed and charged against the real estate of the nephews and Mary Thomas. Whether the law allows this to be done need not be considered by us in this case. Suffice it to say, it *was* done and the decree was not appealed from. In this situation of things, with those fees a charge upon the real estate, the subject-matter of the contract in question, the contract price should be diminished by the amount of the fees so charged against the interest of Daniel and Charles William Evans, to-wit, one-half of $800, or $400.

Whether there has been an income from the prop-

erty pending litigation, we do not know. If so, that net income belongs to appellant.

The record does not show that appellant paid the purchase price into court or kept his tender good, hence, he should be charged with interest at six per cent.

The cause is, therefore, reversed and remanded with directions to the lower court to decree the specific performance of the contract and to vest in appellant and out of Daniel and Charles William Evans and the Fidelity Trust Company the title to the Bridges farm, hereinbefore described, and the eighty-five shares of hotel stock awarded to Daniel and Charles William Evans by the partition decree. That court is further directed to require appellant to pay into court for the use of Daniel and Charles William Evans the contract price, $2,600, plus interest at six per cent, diminished, however, by the $400 attorneys' fees due their attorneys now a charge against the real estate, and diminished by any fees the lower court may allow to the Fidelity Trust Company for services as trustee and to its attorneys for services accruing since the decree in partition, and to otherwise proceed in accordance with this opinion.

All concur.