Hoxsey Hotel Company v. Farm & Home Savings & Loan Association of Missouri, and Maurice R. Kemp, Appellants.—163 S. W. (2d) 766.

Division Two, June 17, 1942.

Rehearing Denied, July 28, 1942.

*Barnes & Barnes* and *Ewing, Ewing & Ewing* for appellants.

*Fry & Edwards* for respondent.

PER CURIAM:—This action involves a strip of land front-ing 10 feet on Jefferson Street in the City of Mexico, Missouri, and extending eastwardly 136 feet along the south wall of the building known as the Alamo Hotel. The plaintiff brought suit to quiet title against the appellants, the Farm & Home Savings & Loan Associa-tion of Missouri (hereafter referred to as the Association), and Morris R. Kemp, who were, respectively, the beneficiary of a purchase money deed of trust and the owner of the Alamo Hotel. The appellants joined as additional parties, James W. Gallaher and Forest T. Noel, former owners of the 10-foot strip in controversy, and Jayne T. Noel, the wife of Forest T. Noel. The appellants filed a cross bill. The first count claims title to the 10-foot strip by adverse possession. The second count claims easements of passageway, light and air. The third count is ambiguous, but apparently seeks reformation as to the 10-foot strip, and was so treated in the court below and in the briefs of both parties in this court. Each count contains an addi-tional general prayer for further or other relief. The trial court made a geneal finding in favor of the plaintiff and against the appel-lants, but he also filed a memorandum which discloses the theory on which each count was decided.

About 1917 or 1918, J. W. Gallaher and his brother-in-law, J. E. Streif, owned a rectangular tract at the southeast corner of Liberty and Jefferson streets in the City of Mexico, Missouri. This tract is referred to in the record, for convenience, as Tract 1. In the south-west corner of said tract they built a portion of what is now the Alamo Hotel. While the building was being constructed it developed that the southern wall encroached 2.8 feet on the abutting property to the south, owned by the Chicago & Alton Railroad Company. As a result, Gallaher and Streif acquired title to a 2.8-foot strip to the south, fronting on Jefferson Street, but extending back only 120 feet, that is, lacking 16 feet of reaching the rear or easterly line of the aforesaid Tract 1. This strip is referred to as Tract 2. The building as originally constructed had its south wall flush with the south line of Tract 2 and encroached on the railroad property to the extent of a small concrete light well, covered by an iron grating, which afforded light and air to the basement in the front part of the building. There was a door from the lobby of the hotel opening onto the railroad property from the south side of the building close to Jefferson Street. There were windows all along the south wall.

The hotel was enlarged about 1921 by extending the building north to Jefferson Street. It was again enlarged about 1923 or 1924 by extending the south part of the building eastwardly until it came within 6 feet, 10 inches of the rear of Tract 1. This involved another encroachment on the railroad property, since Tract 2, a 2.8-foot strip, was 16 feet short of meeting the extension of the east line of Tract 1.

On February 28, 1924, about the time this addition was built along the south line of the property to the east, Gallaher *individually* acquired a strip of land from the railroad company which fronted 10 feet on Jefferson Street and included the 10-foot strip in controversy, but had a considerably greater depth to the east, and included the 2.8-foot strip upon which the southeast corner of the building encroached. The consideration was $1400. The 10x136 feet portion of the strip fronting on Jefferson Street is the strip in controversy and is referred to as Tract 3. It adjoins the southern wall of the Alamo Hotel and extends 6 feet, 10 inches further east. A portion of the land that Gallaher thus acquired from the railroad company included a small strip having east and west dimensions of 16 feet and north and south dimensions of 2.8 feet, referred to as Tract 4. This small tract lies immediately to the east of Tract 2 and immediately to the north of the east 16 feet of Tract 3, the strip in controversy. Tracts 1, 2, 3 and 4 together form a rectangle at the southeast corner of Jefferson and Liberty streets, having north and south dimensions of approximately 127 feet and east and west dimensions of 136 feet.

About 1927 or 1928 the lessee of the Alamo Hotel converted all of the rooms along the south side of the hotel back of the lobby, except the rear storage room, into apartments. Additional doors (making five in all) were cut in the south wall, and the previous inside doors, which had led, successively, through these rooms (formerly storage or display rooms), were walled up, with the result that the only access to these apartments and the rear storage room along the south side of the building was by way of Tract 3, the strip in controversy. About this time a prior board walk was replaced with a concrete walk which towards the front of the building took up all but 4 inches of the frontage of the 10-foot strip, but narrowed to approximately 3 feet, 6 inches along the apartments to the rear. Along the south side of the walk towards the front or Jefferson Street was an iron railing (since removed), and the walk surrounded, except on the building side, the light well and the iron grating, which was flush with the surface of the walk. Towards the front or Jefferson Street side of the building the walk was close to the surface of the ground, but towards the rear the ground sloped back and the walk was approximately a foot high, being built of solid concrete, flush against the wall of the building, and the stone doorsteps of the rear doors overlapped the top of the walk an inch or two. This walk extended back past the rear door on the south side and stopped within

about 6 feet of the rear or southeast corner of the building. From this corner a fence (with a gate) extended to the south across the width of the strip in controversy, and then went an undisclosed distance to the east onto other property. The record contains a number of photographs showing the physical condition of the south side of the building and the strip in controversy, and it appears that this had been substantially its condition since about 1927 or 1928. These pictures show a total of five doors on the east side and that the walk and the light well, covered by the grating, are not only physically attached, but are as much an integral part of the building as improvements of this character could be. To the south of the strip in controversy is a lawn on property owned by the railroad company. However, the lawn was kept up by the lessee of the hotel company and was to some extent used by its guests. During the summer time lawn chairs would be placed on the wide part of the walk with a sign that they were for the use of the guests of the hotel, and there were awnings which extended out from the building over the strip in controversy.

Gallaher was for a number of years the agent, field man and examiner of the Association, and it was on his recommendation that loans were made. Gallaher and his brother-in-law Streif, placed a loan on the Alamo Hotel with the Association, which was from time to time extended. The deed of trust covered only Tracts 1 and 2, and did not cover Tract 3, the strip in controversy, or Tract 4, the small strip including part of the southeast corner of the building. Busiek, the vice president of the Association, testified that when he examined the property about 1931 or 1932, he asked Gallaher about the southern boundary of the property, and was told that it did not include the lawn or park belonging to the railroad company, but included the strip involved in the controversy. Gallaher denied this testimony. Gallaher began having financial difficulties, and in connection with an adjustment the Association made with him in 1934, he was requested to list his properties. He did this, including the hotel property by its incorrect metes and bounds description, but omitting the 10-foot strip, and he also omitted certain other property. The Association then selected certain properties, including the Alamo Hotel property (but without the 10-foot strip) in which they thought he still had an equity, and as part of the settlement at that time, he agreed not to convey said property without the consent of the Association. The record indicates that he knowingly omitted this strip. In 1935 Gallaher became further involved and steps were taken to settle his indebtedness and terminate his agency, but with the understanding that the Association would receive the good will and cooperation of Gallaher in changing to a new agent. On April 19, 1935, the Association made a written proposition to Gallaher providing that various notes, either of Gallaher individually, or of Gallaher

886

and his brother-in-law Streif, including the note secured by the deed of trust on the Alamo Hotel, should be canceled, and·Gallaher and Streif were to "cause to be conveyed to the Association good merchantable title to the *Alamo·Hotel property* in Mexico, Missouri, being the property more particularly described in the deed of trust to the Association securing note in the principal sum of $70,000.00 above mentioned . . ."; and either Gallaher, or he and Streif, were to do other things in connection with the Alamo Hotel property transaction, such, for example, as giving a bill of sale on personal property; and further providing "one of the considerations moving to the Association for relieving you from the indebtedness above mentioned is that it will receive your good will and cooperation in the handling of its present and future business in Mexico, Missouri, through such agent or agency as the Association may select." This was followed by a warranty deed dated April 24, 1935, from Gallaher and Streif and wife to the Association. This deed covered only Tracts 1 and 2. Thus it did not include the 10-foot strip in controversy, nor the small tract known as Tract 4, which included the southeast corner of the building. It soon developed that this deed did not express the intent of the parties. Gallaher had built a small building on the northeast corner of Tract 1, known as the monument shop. It does not appear whether this building was built after the deed of trust had been placed on Tracts 1 and 2, or whether there had been some mistake in including all of Tracts 1 and 2 when executing the deed of trust intended to cover the Alamo Hotel property. At any rate, early in 1936, Gallaher contacted Busiek, the vice president of the Association, and was much concerned over having deeded the· monument property to the Association. At that time he pointed out to Busiek that the small Tract 4 had not been included. In substance, Gallaher's representations to Busiek were to the effect that he had deeded everything that he had pertaining to the hotel, except the small Tract 4, which had been overlooked, and that the monument shop property at the northeast corner should be deeded to him, as it was not part of the Alamo Hotel property. Busiek concurred in this interpretation of the transaction, except that he contended that an easement should be reserved along the west side of the monument property, as it was a driveway between the hotel property and the monument property from which access was had to the rear of the hotel property. It does not appear whether Gallaher had intentionally withheld Tract 4 from the deed to the Association, but he admits that he was fully aware of his title to the 10-foot strip in controversy, and that he had never disclosed his title to the Savings & Loan Association. It is apparent that Busiek ▇▇▇ was acting under the supposition that Tract 4 was located at the southeast corner of the 10-foot strip in controversy. His testimony, which is not disputed by Gallaher, is to the effect that he told Gallaher he considered Tract 4 as

being of very little consequence. This is understandable if he thought that it covered only a narrow strip of vacant ground several feet to the south of the southern edge of the 3½-foot walk attached to that part of the building. It is not likely that such a statement would have been made if he had known that Tract 4 in fact included part of the building. As a result, in 1936 the Association quitclaimed to Gallaher and Streif the monument property, reserving the driveway easement as aforesaid, and Gallaher deeded Tract 4 to the Association by warranty deed.

In the summer of 1937 Gallaher first asserted to the Association an adverse claim to the strip in controversy. He wanted $1400, which was the price that he had paid the railroad company · for nearly twice as much property. The Association contended it was entitled to a deed from Gallaher without any further payment. Gallaher deeded the property (for $1400) to his son-in-law and prospective partner Noel, who raised the price to $3000, which the Association refused to pay.

Zollmann, a St. Louis man, had been trying, without success, to buy the Alamo Hotel. He formed the plaintiff Hoxsey Hotel Company to take title to the Hoxsey Hotel across the street, and had obtained a lease of a large part of the Alamo Hotel for the plaintiff. In December, 1937, he bought the strip in controversy from Noel for the plaintiff for $2600 ($2500, plus an additional consideration computed as worth $100). In October, 1938, appellant Kemp bought the Alamo Hotel (receiving a separate quitclaim deed as to the 10-foot strip), and gave back a purchase money deed of trust. ·Kemp knew about the outstanding deeds to the strip. Both Noel and Zollmann were fully aware of the physical condition of the strip, and the use to which it had been put, when they bought. Although Zollmann · denied that his purpose in purchasing the strip was to hold a club over the appellants, there was evidence to justify the inference that the purpose was to assist the plaintiff in purchasing the Alamo Hotel at a favorable price.

██ ██ I. Although the original petition stated a cause of action at law, the cross bill of appellants presented equitable issues, and this rendered the entire cause one in equity. [Rains v. Moulder, 338 Mo. 275, 90 S. W. (2d) 81.] We are, therefore, not bound by the findings of the trial court. The first count of the appellants' cross bill asserts title by adverse possession to the 10-foot strip in question. The record shows adverse possession after Gallaher and Streif conveyed to the Association. But this period is much less than the required ten years, and the appellants therefore will have to rely on possession for a number of years prior to this conveyance. The record shows that Hoxsey, the tenant of Gallaher and Streif, performed acts of possession, but the question is whether this possession was adverse and hostile to Gallaher, the owner of the strip. Whether or not the pos-

session of Hoxsey as a tenant of Gallaher and Streif could, as a matter of law, be hostile to Gallaher, the record indicates that Hoxsey's possession was permissive and not hostile. We rule that the appellants. failed to establish title by adverse possession.

■. II. The second count of appellants' cross bill sets up implied easements of way, light and air. This count presents a novel question of whether there was sufficient unity of ownership for an easement of necessity to be implied, and the question (not determined by this court) whether an easement of necessity can, as a matter of law, ever be implied as to light and air. The view we take with respect to the third count makes it unnecessary to pass on these questions, and they are, accordingly, left undetermined.

■ III. The third count of the cross bill is ambiguous, but was treated by the parties and the trial court as being an action for reformation, and it is so treated in the briefs on each side. The trial court considered that reformation could be had only where there was mutual mistake, and that fraud would defeat reformation. We think reformation may be had where there is a mistake on the part of one party caused by fraud or inequitable conduct of the other party, as well as in the case of mutual mistake. [Lauffer v. Smith, 337 Mo. 22, 85 S. W. (2d) 94; Luker v. Moffett, 327 Mo. 929, 38 S. W. (2d) 1037; 53 C. J., pp. 938, 949.]

■ Gallaher was the trusted agent of the Association. He was its examiner, and the man on whom it relied in making loans. In dealing with the Association he was ■ bound by the same rules that would apply to an attorney entering into a business transaction with his client. He is charged with establishing that he acted with complete good faith and made a full disclosure of every material fact bearing on the transaction. [Evans v. Evans, 196 Mo. 1, 93 S. W. 969; Holt v. Joseph F. Dickman Real Estate Co. (Mo. App.), 140 S. W. (2d) 59; 3 C. J. S., p. 25; 2 Am. Jur., sec. 269.] The same rules apply to transactions occurring after the termination of the agency, if they are connected with the subject matter of the agency. [Evans v. Evans, supra.]

■ The transaction of April, 1935, whereby Gallaher's deed of trust was canceled and he and Streif were to convey the hotel property, was not only an outgrowth of a loan transaction connected with the agency, but was an incident to winding up the entire agency. The subsequent transaction in 1936, when corrective deeds were exchanged, was an outgrowth of the 1935 transaction, and occurred while the Association still had trust and confidence in Gallaher. It was Gallaher's affirmative duty to notify the Association at the time or times that it made or extended the loan that the deed of trust failed to cover the southeast corner of the building and the 10-foot strip, including the permanent improvements attached to the building,

which was necessary to assure access to a substantial part of the building, and to protect the building against the possibility of a wall being built which would block off five doors and 36 windows. Gallaher knew what the situation was, but took the position that if the Association failed to make discovery from the recorder's office, he would not advise his principal. He would even withhold the information when purporting to list his real estate assets in connection with another transaction with his principal. And we think there was more than mere silence when he executed the 1935 and 1936 deeds, though silence would be enough to invoke the action of a court of equity. It may be that the Association was negligent in not having a survey made, or in failing to at least take measurement to ascertain whether the hotel property on the ground (which obviously included the 10-foot strip), was included in the description of the deed of trust and the subsequent deeds. But it was not dealing at arm's length with Gallaher. He was an experienced real estate man—its trusted agent who was supposed to safeguard its interests. At any rate, it was entitled to rely on a full disclosure—which was not made.

There can be no doubt that the Association thought it was acquiring the strip. True, neither the deed of trust nor the subsequent deeds to the Association described the strip. But the written proposal of April 19, 1935, refers to ". . . the Alamo Hotel *property* . . ., being the property more particularly described in the deed of trust . . ." The "property" obviously included the strip. The record clearly shows that both parties interpreted the transaction as covering the hotel property, in spite of whether the legal description was in accord. The 1936 exchange of deeds was for the purported purpose of effectuating the intent of the parties by having the Association deed the monument property, which was not part of the hotel property (except for the reserved easement), and receive a deed covering the part of the hotel property that had been omitted. The substance of Busiek's testimony is that Gallaher told him that he had omitted 2½ feet on the southeast corner of the *lot*, and Busiek, looking down the strip, told Gallaher that 2½ feet at the back end of the strip didn't make any difference. Gallaher does not directly deny this conversation. The only honest excuse that Gallaher could make would be that he thought he was merely completing the 10-foot strip. This would be a mutual mistake of fact. But he does not make this excuse. As a result, the only proper inference to draw is that he deliberately misled Busiek, or at least kept silent when he knew that Busiek was acting on the assumption that, after receiving Gallaher's deed, the Association would have title to the complete hotel property, including the 10-foot strip. If title were still in Gallaher, the appellants would be entitled to reformation as to him.

■ We think the appellants are equally entitled to reformation as to the plaintiff. Neither Zollmann nor Noel could be innocent

890

purchasers after viewing the premises, unless they sought full information as to the claim of the Association before they purchased, and were misled by the Association. There is no such evidence. And so the plaintiff is not an innocent purchaser. It is well settled that in a proper case reformation can be had against subsequent purchasers who are charged with notice. [Luker v. Moffett, supra; Kidd v. Brewer, 317 Mo. 1047, 297 S. W. 960; Sicher v. Rambousek, 193 Mo. 113, 91 S. W. 68; 53 C. J., sec. 134, p. 985; 66 C. J., sec. 952, p. 1122; 17 Am. Jur., sec. 131, p. 1019.]

Both Gallaher and Noel have deeded the strip, and in this action disclaim any title. A decree should be entered divesting plaintiff of title to the 10-foot strip and vesting the same in the appellants in accord with their respective interests. If Gallaher, or his successors in interest, have paid any taxes on the strip, appropriate provission should be made for the appellants to deposit in the registry of the court such amount as the court finds has been paid. The decree of the circuit court is reversed and the cause remanded for further proceedings not inconsistent with this opinion. All concur.