Annie SPARKS, Plaintiff-Respondent,

v.

Donald SPARKS and Helen Sparks, Defendants-Appellants.

No. 31747.

St. Louis Court of Appeals. Missouri.

Feb. 16, 1965.

Motion for Rehearing or to Transfer to Supreme Court Denied March 18, 1965.

Morton L. Schwartz, Frank Groom Kirtz, St. Louis, for defendants-appellants.

Dearing, Richeson & Weier, Samuel Richeson, Hillsboro, for plaintiff-respondent.

ANDERSON, Judge.

This is a suit in equity filed by Annie Sparks against Donald Sparks and Helen Sparks. The petition is in three counts. In Count I, plaintiff sought reformation of an agreement between the parties dated April 4, 1960, so that it would express the true agreement and understanding between them, and that defendants be required to

make, execute and deliver to plaintiff a note in the amount of $45,000, subject to all proper credits, secured by a deed of trust upon the premises known as Sparks Funeral Home, and a chattel mortgage upon certain personal property, said note to be payable in ten equal annual installments beginning April 4, 1961 with interest at four percent (4%) per annum, payable quarterly, without any provision for cancellation of indebtedness at plaintiff's death. Count II sought reformation of the note, deed of trust and chattel mortgage theretofore given so as to conform to the true agreement of the parties. Count III is not involved on this appeal since there was a finding and judgment for defendant on this Count. The trial court found for plaintiff on Count I and Count II and entered judgment of reformation. From this judgment, defendants have appealed.

The facts alleged as the basis of recovery under Count I are substantially as follows: That Jenkins and wife owned the Sparks Funeral Home in Potosi, upon which plaintiff held a deed of trust securing a note for $25,000. Defendants agree to purchase said property. Defendants requested plaintiff to cancel said deed of trust, lend them $20,000 additional, and to accept therefor a new note in the sum of $45,000 secured by a deed of trust, and a chattel mortgage on the equipment of said business. Plaintiff agreed to do this upon the promise that said indebtedness would be paid in ten equal installments, beginning April 4, 1961, with interest on the unpaid balance at 4% payable quarterly. The defendants assured plaintiff, who was not represented by counsel, that they would employ an attorney to prepare the documents in accordance with such terms, and plaintiff permitted defendants to do so; that said documents were prepared in violation of the agreement and in fraud of plaintiff's rights, in that it purported to be a testamentary disposition of plaintiff's interest in the $45,000 deed of trust, subject to certain limited payments to be made by defendants. That defendants falsely represented to

plaintiff that the principal and interest payments provided by said contract were such that such payments would be fully discharged in a period of ten years in accordance with their understanding whereas in truth and in fact the instrument was so drawn as to permit payments to be extended over a period of 25 years, with any balance due upon plaintiff's death to be extinguished; that said representations were known by defendants to be untrue; that plaintiff believed said representations, and relied thereon, and was damaged and prejudiced thereby.

It was further alleged that said instrument was void for the reason that it purports to be a testamentary disposition of plaintiff's property executed without the formalities necessary to a valid will; that there was no consideration to plaintiff for the execution thereof or adequate consideration for the purported waiver of the balance remaining due at the death of plaintiff.

By Count II of the petition, the allegations of fact contained in Count I were adopted by reference. It was then alleged that defendants in furtherance of their scheme to defraud plaintiff executed a promissory note for $45,000, containing a provision that it was " * * * to be released and any unpaid balance extinguished as though paid in full immediately upon the death of Annie Sparks."

It was then alleged that the note was fraudulent and void for the reason it was not executed with the formality of a will, and was not drawn in accordance with the understanding of the parties in that payments of the principal were limited to quarterly installments of 6% of the receipts of Sparks Funeral Home, and provided for extinguishment upon the death of plaintiff.

It was further alleged that the deed of trust securing the note contained the following language, among other things:

" * * * the terms of the promissory note executed by Donald P. Sparks are

covered in the collateral agreement executed this date and witnessed by Helen Sparks and Bert Cross.

"The said note shall have the following restriction on it:

"Upon the death of the Third Party, to wit, Annie Sparks, the balance of the principal, if any, then due and owing shall be cancelled and released and the debt shall be extinguished and the lien or encumbrance created by this Deed of Trust shall at the same moment be extinguished and this Deed shall be released as of record by the presentation to the Recorder of Deeds of Washington County of the certificate of death of Annie Sparks or the affidavit of death of Annie Sparks. This shall not be construed as a present gift, but a gift of any balance due from Donald P. Sparks to Annie Sparks at the time of her death."

It was then alleged that said deed of of trust was fraudulent, illegal, and improperly drawn for the reasons theretofore stated.

The material averments of defendant's answer put in issue the allegations of fraud contained in the petition and alleged that the contract, note and mortgage accurately expressed the agreement of the parties.

Annie Sparks was, at the time of the trial (Feb. 9, 1962) seventy-four years old. For several years, she and her husband had been engaged in the operation of a funeral home in Potosi. Her husband died in 1945. After his death, Annie operated the funeral home alone for some time; but later sold the business to Oman Jenkins. Jenkins operated the business for about a year. During that time certain matters developed between Annie Sparks and Jenkins which caused her to be dissatisfied with the latter's operation and induced her to believe that it would be desirable that someone other than Jenkins operate the funeral home. With that in mind, she had several discussions with her nephew, Donald Sparks,

concerning the purchase by him of the funeral home. Shortly before April 4, 1960, at a conference at her home in Potosi, she and Donald reached an agreement regarding the purchase by him of the business. Richard Smitty was present at this conference. The agreement reached at this conference was oral.

Annie Sparks testified that the terms agreed upon at this conference were that Donald Sparks would pay $50,000 for the funeral home; that she would cancel a $25,000 indebtedness owed her by Jenkins; that she would advance the additional $25,000 necessary to purchase the property from Jenkins; that she would accept new paper from Donald Sparks, and that he would make a down payment to her of nine or ten thousand dollars when he sold his home. In connection with this advancement, Donald executed to her a promissory note in the amount of $5,000 which was later paid, and the remaining $20,000 which was put up in cash by Mrs. Annie Sparks, was added to the existing indebtedness against the funeral home property, so that the total remaining indebtedness was $45,000.

Mrs. Sparks further testified that it was agreed the indebtedness would be retired at the rate of $5,000 per year with interest at the rate of four percent per annum on the unpaid balance payable quarterly. The note for $5,000 was afterwards paid by Donald, and Mrs. Sparks considered this the first payment under their agreement.

Richard Smitty testified for plaintiff. He stated that he was present in Annie Sparks home when she and Donald reached an agreement with reference to the sale of the funeral home, and heard the discussion between them with reference to the sale. He stated that the agreement reached was that there would be a down payment of $10,000 and that the balance would be paid at the rate of $5,000 a year, with interest at four percent payable quarterly. On cross-examination, he first testified " * * * what Donald Sparks and

Mrs. Annie Sparks have between themselves is beyond my knowledge, for a down payment, * * * it was discussed, what they discussed after that is beyond my knowledge, I don't know. * * * I wouldn't say that he agreed directly to anything, * * * just an agreement * * * just talking business terms."

"Q. Did you ever see the agreement?

"A. No, I never did.

"Q. Did you ever see anything in writing on this at all?

"A. Never. * * *

"Q. Did you hear Donald Sparks agree to pay $10,000 down?

"A. We both agreed to it. (Smitty was also considering buying the property at the time.)

"Q. Five thousand a year * * * ?

"A. Five thousand a year, plus interest of four percent quarterly, that's every three months.

"Q. How was the principal to be paid, once a year or quarterly?

"A. Quarterly."

It is apparent that when the witness testified that he "wouldn't say that he (Donald Sparks) agreed to anything," he had in mind the written contract executed after the meeting. Therefore, it can be said that his testimony corroborated that of Mrs. Sparks.

Annie Sparks testified that after the terms of the agreement were settled, she wanted to have the papers drawn at Potosi, but Donald said, " * * * no, Aunt Annie, let me take them up to St. Louis and have my lawyer fix them up, and said, he'll fix them up right * * *." She further testified that she had so much confidence in Donald, she believed every word he told her. After the foregoing conversation, Donald left plaintiff's house.

Thereafter, Donald Sparks returned with the documents to complete the sale as previously agreed upon. They were prepared by his attorney. One of these documents was a contract to sell the premises in question. It was prepared as a tripartite agreement between Jenkins and his wife, Dora, as sellers; Donald Sparks, as buyer and Annie Sparks, as mortgagee. By its terms Oman Jenkins and Dora Jenkins agreed to sell the funeral home to Donald P. Sparks and the latter agreed to purchase same. $50,000 was specified as the purchase price. Annie Sparks agreed to execute a deed of release then held by her of the liens on said property. Donald Sparks agreed to execute a new note and mortgage in favor of Annie Sparks to replace said indebtedness and to cover such other sum loaned to Donald Sparks which would be necessary for him to complete said purchase. It was provided that the buyer, Donald Sparks, would pay the seller $25,000 in the form of a cashier's check, the balance of the purchase price to be covered by the deed of release executed by Annie Sparks. The seller agreed to execute the necessary warranty deed to the real property and a bill of sale covering the personal property sold. There was a legal description of the real estate and the items of personal property sold. Attached to the exhibit was a separate contract to be executed by Annie Sparks and Donald Sparks. It provides that Annie Sparks would release the $25,000 note and deed of trust securing same held by her on the funeral home; and in lieu thereof, Donald Sparks would execute a promissory note for $45,000 in favor of Annie Sparks with four percent interest per annum payable quarterly.

It was further provided by said contract as follows:

" * * * and Donald P. Sparks agrees to pay 6% of the gross receipts for each described quarter on April 15, July 15, October 15, and January 15, respectively; HOWEVER, the above described interest payment shall be de-

ducted first from the 6% of the gross receipts so that Donald P. Sparks will never pay an amount greater than either one percent of the balance due on the principal of the said note, nor 6% of the gross receipts during the preceding quarter of a year at any of the described payment period, * * *."

Said contract further provides that the note would be secured by a deed of trust on the real property and a chattel mortgage on the personal property purchased from Oman Jenkins and his wife, Dora. It provided for repayment privilege without penalty or extra interest charge.

It was further provided in said contract that Annie Sparks would co-sign as an accommodation endorser with Donald Sparks a promissory note at the bank of Irondale in the amount of $5,000 to enable Donald Sparks to close the deal for the purchase of the funeral home, which would be retired by the net proceeds of a sale by Donald Sparks of real estate listed for sale by him; that Annie Sparks would act as a special consultant in the operation of the funeral home, but that Donald Sparks should make all final decisions in the management and conduct of the business. The contract also made provision for the turning over to Donald Sparks certain assets and a number of insurance policies held by her, in trust, as prepaid funeral expenses of persons then living upon the death of said persons.

The contract then contained the following provision:

"Now therefore, in consideration of mutual promises herein contained Annie Sparks does hereby promise and agree to will, devise and bequeath to Donald P. Sparks whatever right, title and interest that she has under the aforedescribed $45,000.00 promissory note and the Deed of Trust and Chattel Mortgage that secures the said $45,000.00 notes, and in behalf of her estate, executors, administrators, heirs and legatees, if any, Annie Sparks does hereby release and waive any and all obligations, liens and mortgages that she holds against the funeral home at Potosi, the real property upon which it is situated and all the personal and mixed property used in connection therewith, the property, real, personal and mixed that is now used with said funeral home, the exact description of all said property is set out in an agreement among Oman Jenkins and his wife, Donald P. Sparks and Annie Sparks and that she hold against Donald P. Sparks individually and any corporation formed by him to conduct the said funeral business, so that Donald P. Sparks, will be free and clear of any debt to her estate, heirs, administrators and executors.

"IN WITNESS WHEREOF, the parties hereto affix their hand and seal this          day of          , 1960.

(SIGNED)     Annie Sparks                    Donald P. Sparks

"We, the undersigned, do certify that Annie Sparks and Donald P. Sparks the above named parties on the day and year above written signed the foregoing instrument in our presence and published and declare the same to be a testamentary contract, and we, at the same time at their requests, in their presence, and in the presence of each other, have hereunto set our hands as subscribing witnesses and we do certify that at such time they both were of sound and disposing mind.

(SIGNED)     Helen M. Sparks     5061 Washington   St. Louis 8, Mo.
(SIGNED)     Bert Cross          102 Mill          Potosi, Missouri"

The note and Deed of Trust were offered in evidence but do not appear in the transcript. Nor were either of said documents lodged with the clerk. However, defendant in his answer alleged that both note and mortgage contained a provision for automatic cancellation upon the death of plaintiff.

Annie Sparks signed the contracts, received the note and mortgage and advanced the money necessary to complete the purchase.

Annie Sparks testified, that Bert Cross was not present at her home at the time she executed the contract and that she was not present when Bert Cross annexed his signature thereto. Defendant Donald Sparks, gave like testimony. Bert Cross testified he was not present when Annie Sparks signed the instrument, nor was she present when he signed. Annie Sparks further testified that neither Donald Sparks or Helen Sparks signed the contract in her presence.

Donald Sparks was plaintiff's nephew and a second cousin of her husband. Plaintiff stated she wanted Donald to have the funeral home because she loved him the same as her own child, and had helped raise the whole family; that she had confidence in him; that she told him she would forgive any balance due at her death if he would do certain things with respect to providing funerals for her family, but that he had failed to perform these conditions.

Plaintiff further testified that when Donald brought the papers for her to sign, she was not able to determine whether they were made in accordance with the oral arrangements she had made with Donald. When she received the papers, she put them in a drawer and did not have occasion to examine them again until Donald undertook to make the first payment on the note. He brought her $500 as the first payment on the principal. At that time, she asked him if he couldn't pay more, he replied that it was all he was supposed to pay. Shortly after that, she consulted a lawyer.

Donald Sparks testified in substance that Annie Sparks had urged him to buy the funeral home, and told him she would furnish the purchase money and he could repay it to her anyway he wanted to. He stated that she also said she would cancel all indebtedness in her will. He stated that he told Annie Sparks he had some property in St. Louis to sell on which he believed he could receive a nine or ten thousand dollar down payment, and that he would use part of it as a down payment on the purchase of the funeral home and the balance as working capital. He further testified that they discussed the interest and payment of the principal and Annie Sparks told him she would like to have 4% interest and that he could repay the loan anyway he wanted to; that they discussed the percentage of the gross receipts; that after he said 10% was too high, he suggested 6% which she said was all right; that he was supposed to pay her an amount not greater than 6% of the gross receipts after the interest was deducted, which amount would not be greater than one percent of the principal.

Donald further testified that Annie Sparks said she would like to have the papers drawn up in Potosi, but he told her he had a job in St. Louis and could not come all the way to Potosi; that he could get a lawyer in St. Louis and she said for him to get a lawyer and draw up the papers anyway he wanted; that it did not make any difference to her; that they had to get Jenkins out.

Donald further testified that when he brought the written agreement to her, which was prepared by his lawyer in St. Louis, she read it over; that he asked her if there were any questions and that she could have somebody explain it to her if she wanted to, because it was all legal; that he tried to explain everything to her; and that she said as far as she was concerned everything was all right and that she would sign it.

On cross-examination, Donald testified that his lawyer, Schwartz offered to go to Potosi to explain the agreement to Annie Sparks, but he did not think it necessary; that he asked Annie if she wanted to take the papers and have a lawyer or anyone else look at them, but she said, "I don't think that's necessary * * * I trust you." He admitted he did not tell her that under the agreement as drawn, it would take a minimum of twenty-five years to pay off the indebtedness, and that he did not know she would be 96 years old before the debt was liquidated. He further testified that after the agreement was signed, plaintiff gave him $7,000 in cash and two checks, all amounting to $25,000. He stated that the first time Annie Sparks protested was when he took a check to her in October, 1960, which was the first occasion, as far as he knew, she had any knowledge of the amount of money he figured was due under the contract.

Defendant, Helen Sparks, wife of Donald, testified that she was present on one occasion in Annie Sparks home when she expressed dissatisfaction with the way Jenkins was taking care of the business, and stated she wanted Donald to buy it saying that it looked like it was going to take $50,000 to get him out. Helen further testified that Donald said $50,000 was too much money; that on another occasion, Annie told Donald if he would buy it, she would loan him the money and he could repay it anyway he wanted to, and have the papers drawn in anyway he wanted. She further testified that there was a discussion about what she and Donald would get out of the sale of their house, and plaintiff told Donald she would loan him the full amount if he couldn't sell before the deal on the funeral home was closed, and when he sold the house, he could make a down payment; that plaintiff had Donald and her sign a note for a loan of $5,000 for the down payment. She stated she heard plaintiff tell Donald she would put a provision in her will that whatever Donald owed her would be marked paid.

Defendant produced several witnesses who gave opinion to testimony as to the reasonable value of the funeral home. The testimony of these witnesses placed the value far below $50,000, the price agreed upon by the parties to the sale in question. We do not deem a detailed review of this testimony, necessary to the decision of any issue on this appeal.

Plaintiff then called Donald Sparks in rebuttal. He testified that from the date of the agreement, April 4, 1960, until the date of the trial, February 9, 1962, he had paid a total of $1277.31 on the principal of the note and that the gross receipts of the business amounted to $59,399.99, plus an accumulation of $7,000 to $10,000 accounts receivable.

The Court found the issues with respect to Counts I and II in favor of plaintiff, and ordered reformation of the contract between the parties, set aside the provisions with respect to the time, terms and conditions of payment and forgiveness of the unpaid portion of the indebtedness, and prescribed the terms of the reformed agreement which were in accordance with plaintiff's evidence, and prescribed the terms of the new evidence of debt and security required in like manner. As to Count III, the Court found the issues for defendants and denied the injunctive relief prayed.

■ Appellant's first point seems to be that the finding and judgment is against the weight of the evidence. The reasons urged in support of this assignment are that plaintiff's evidence of the oral agreement between the parties should not be considered because it was inadmissible under the parol evidence rule, and for the further reason it was offered merely to show unilateral mistake, which is not a ground for reformation; hence plaintiff failed to sustain her burden of proof; that the Court should have so found and held that the written contract was valid and embodied the true agreement of the parties. Plaintiff's evidence was not offered merely to show uni-

lateral mistake on the part of plaintiff. An examination of the petition shows allegations of mistake on the part of plaintiff caused by fraud or inequitable conduct on the part of the defendant, Donald Sparks. Plaintiff offered evidence in support of these allegations, which if believed would warrant reformation of the contract in accordance with the true intent of the parties. Citizens Bank of Festus v. Frazier, 352 Mo. 367, 177 S.W.2d 477; Hoxsey Hotel Co. v. Farm & Home Savings & Loan Association of Missouri, 349 Mo. 880, 163 S.W.2d 766; Lauffer v. Smith, 337 Mo. 22, 85 S.W.2d 94. 76 C.J.S. Reformation of Instruments § 29, pp. 371–372.

■ There is no merit to the contentions made. In a suit in equity for reformation on the ground of fraud on the one part and mistake on the other, as was pleaded in this action, parol evidence is admissible to show the actual agreement of the parties. Employers' Indemnity Corporation v. Garrett, 327 Mo. 874, 38 S.W.2d 1049; McCormick v. Edwards, 351 Mo. 1017, 174 S.W.2d 826.

■ If the testimony of plaintiff and her witness, Richard Smitty, is to be believed, the proof of plaintiff's right to reformation is clear, cogent and convincing, and the judgment should be affirmed. 76 C.J.S. Reformation of Instruments § 29, pp. 371–372. On the other hand, if the testimony of Donald Sparks and his witnesses is true, the judgment should go against plaintiff and in favor of defendants. Therefore the disposition of the case is largely dependent upon a question of credibility of the witnesses. As to that, we feel compelled to defer to findings of the trial court, who had the witnesses before him, and observed their demeanor as they detailed their testimony concerning the matter at issue. His finding had to be based upon the acceptance of plaintiff's version, and we therefore defer to the trial court and accept its findings upon the issue of fact. We might add that said finding seems amply supported by other considerations not the least of which was the unconscionable bargain which defendant, who we find stood in a confidential relationship with plaintiff, will have made unless the contract as written is not reformed.

■ The next point urged is that the Court erred in ordering deleted from the contract and note the provision that upon the death of plaintiff the unpaid balance of the debt would be forgiven, because it was against the expressed intention of the plaintiff as gathered from her testimony.

There is no testimony in the record that it was agreed between the parties that the above mentioned provision should be incorporated in the contract or in the note and mortgage. Plaintiff testified merely that she told Donald she would forgive any balance at her death if he did certain things, which he failed to do. Donald's version was that plaintiff told him she would cancel all indebtedness by her will.

It is next urged that the Court erred in reforming the contract so as to provide for the payment of $5,000 a year on the principal, beginning April 4, 1961, for the reason that said order was beyond the scope of the pleadings in that the petition sought a modification to provide for payment of the installments of $4,500 each.

■ Plaintiff testified that she considered the $5,000 down payment as the first payment on the $50,000 purchase and that the remaining installments of the indebtedness were to be paid at the rate of $5,000 per year. This evidence went in without any objection that it was not within the scope of the pleadings. Therefore, the pleadings will be considered as amended to conform to the proof. We must rule against appellant on this assignment.

■ It is next urged that the Court erred in failing to find the exact amount paid plaintiff by defendants in principal and interest to the date of judgment.

There was no prayer in the pleadings by either party requesting such determina-

tion. The suit involved merely the matter of reformation, and not the ascertainment or collection of the amounts due. There was no issue made of the amounts paid. If, hereafter, it should become necessary to foreclose the deed of trust, defendants will have ample opportunity to establish any credits on the note to which they are entitled. There is no merit to the complaint made.

■ The next point urged is that the Court erred in creating a new contract for the parties. There is no merit to this contention. The Court in the exercise of its equitable jurisdiction in this case did not assume to make a new contract for the parties; it merely gave effect to the real contract they made by ordering the evidence thereof drawn to conform to said agreement. Miller v. St. Louis & Kansas City Ry. Co., 162 Mo. 424, 63 S.W. 85, 1. c. 441; Meyer et ux. v. Young et ux., 23 Wash.2d 109, 159 P.2d 908.

Appellant's final assignment of error is that the court erred in entering its decree for reformation, in view of the fact that plaintiff admitted she read only parts of the contract, and in view of rule of law that one who signs a contract is presumed to have read it.

Plaintiff testified that when Donald brought the papers to her for her to sign, she read only part of the contract but was unable to determine whether or not it was drawn in accordance with the oral agreement; that she did not understand it. She further testified that she did not read the note and deed of trust because she trusted Donald. It does not appear what part of the contract she read, but be that as it may, it is not surprising that she did not understand it, for it is a strange document drawn in such a manner as would confuse the ordinary lawyer skilled in the interpretation of legal documents. To such a person it would require careful reading and re-reading to discover its meaning. It seems to be a contract and testamentary disposition of property all in one instru-

ment, although it could not be the latter because it was not executed with the formalities necessary to the execution of a valid will.

Plaintiff possessed a limited education, having quit school before completing the eighth grade. Furthermore, we find there was a confidential relationship existing between her and her nephew, which imposed upon Donald the duty of fully disclosing all material information with reference to the documents which he possessed. Morris v. Hanssen, 336 Mo. 169, 78 S.W.2d 87.

■ Defendant's contention amounts to a plea of negligence on the part of plaintiff in failing to read the documents before signing the contract. Such a plea has in some instance been upheld where mutual mistake is relied upon as grounds for reformation, but will not be sustained where there is excusable neglect. Berry v. Continental Life Ins. Co., 224 Mo.App. 1207, 33 S.W.2d 1016. But we have been cited to no case where such negligence has defeated reformation for fraud or misplaced confidence as in the case at bar. In our opinion, it should not be applied in such cases. The correct rule in our judgment is stated in McKleroy v. Dishman, 225 Ala. 131, 142 So. 41, 1. c. 45, as follows:

"More clearly and obviously, the grantor cannot set up the negligence of the grantee in failing to read the instrument, if the fraud or inequitable conduct of the grantor caused the instrument to be drawn or accepted with provisions at variance with the true agreement. One cannot complain of misplaced confidence in himself. If, on the whole, denial of relief will work a fraud on the grantee, a court of equity will not sustain such defense."

In Hammond Hotel & Improvement Co. v. Perrin, 96 Ind.App. 311, 184 N.E. 906, a lessor in drawing up a lease omitted a

certain provision agreed upon by the parties. It was urged on appeal that the lessee was negligent in not discovering the omission, and therefore, was not entitled to the relief of reformation. In disposing of this contention, the Court said:

"Appellant raises the question that appellee was guilty of negligence in not ascertaining that this clause was omitted from the lease, and hence could not be heard to raise the question now. It would be a peculiar situation indeed to hold that, where the law imposed the duty upon appellant, as it does, to disclose to the appellee that it had omitted from the written lease an important clause, which it had agreed to insert therein, to say in effect, We have failed to incorporate this in the lease, notwithstanding the fact that we agreed to insert it; but it is for you to discover the omission, and, if you fail to discover it, you are negligent and will have to abide by the contract as written by us.

"One cannot deceive another as to matters which he is bound to disclose, and then deny him relief by saying that he was negligent in not finding out that he was being deceived."

See also, Panhandle Lumber Co. v. Rancour, 24 Idaho 603, 135 P. 558; Ward et al. v. Lyman, 108 Vt. 464, 188 A. 892; Tomas v. Vaughn et al., 63 Cal.App.2d 188, 146 P.2d 499.

It would be a monstrous perversion of justice to deny plaintiff the right of reformation upon the ground that she was negligent in not reading the entire contract and in failing to read the note and mortgage before signing the contract, under the facts and circumstances shown. Defendant, Donald acting for himself and wife by his attempt to take advantage of plaintiff's failure to discover the fraud does not assume a position that commends him to a court of equity. It is inconsistent and inequitable for defendants to rely upon plaintiff's negligence in failing to discover the fraud under the facts in this case. Defendants should not be relieved of the consequence of the fraud of Donald which would be beneficial to them.

We cannot agree with defendants that by signing a contract there is a presumption that the person who signs has read it, which presumption cannot be overcome by evidence in a suit in equity for reformation. The books are full of such cases.

We find no merit whatever to the appeal in this case. Our findings on the merit are in accord with those of the trial court.

The judgment is affirmed.

WOLFE, Acting P. J., and R. KENNETH ELLIOTT, Special Judge, concur.