402 F.2d 339
 29 A.L.R.3d 753
 MUTUAL OF OMAHA INSURANCE COMPANY, a corporation, Appellant,
v.
Elmer D. RUSSELL, Appellee.
Elmer D. RUSSELL, Cross-Appellant,
v.
MUTUAL OF OMAHA INSURANCE COMPANY, a corporation, Cross-Appellee.
 Nos. 9169, 9182.
 United States Court of Appeals Tenth Circuit.
 Sept. 30, 1968, Rehearing Denied Dec. 9, 1968.
 
 Henry G. Eager, Kansas City, Mo., for appellant and cross-appellee.
 John E. Shamberg, Kansas City, Kan., for appellee and cross-appellant.
 Before MURRAH, Chief Judge, JOHN R. BROWN* and HICKEY, Circuit judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 Does the speed of the modern jet age and the restless, irrepressible, increased tempo of all who are in its vortex impose on a flight insurer the obligation toward prospective policy buyers of explaining the distinctive differences of the several available coverages? Does the insurer's attractive sales booth, neon signs heralding the need for and availability of 'flight insurance,' and the other catchy advertising come-ons carry the inevitable message to scurrying people on the move the notion that the coverage is for the traveler's intended round trip rather than for a definitive period of time? And to avoid this misreading by people in a hurry of printed contracts plain enough that even those who run may read, must the insurer affirmatively take steps by extra-contract informational statements to overcome such misapprehension?
 
 
 2
 The District Judge, in effect, answered these broad inquiries in the affirmative. The failure to give such informational advice became, in his analysis, a constructive fraud upon which to base reformation of a flight insurance policy which, all now agree, did not by its terms cover the death of the Assured. In more austere terms the main issue presented for decision is whether the Assured[1] is entitled to reformation of a general accident flight insurance policy purchased at Insurer's[2] sales booth in the lobby of an airport. The District Court reformed the contract and awarded plaintiff $20,000. We hold that under the unusual fact situation of this case the insurance policy should not have been reformed and the decision of the District Court must be reversed.
 
 
 3
 To understand fully the Assured's theory a full recitation of the facts is helpful. Rev. and Mrs. Russell were residents of Kansas City, Kansas. On Thursday, January 24, 1963, upon receiving word that one of her brothers had died in Lubbock, Texas, Mrs. Russell decided to fly to Lubbock for the funeral. Reservations were made for a flight the next day, Friday, but the return flight was left open because the funeral date had not been set. On Friday Rev. and Mrs. Russell and their son[3] went to the airport in Kansas City, Missouri, picked up their tickets at the Continental Airlines counter, and proceeded toward the awaiting plane.
 
 
 4
 As the three Russells passed one of Insurer's vending machines for dispening flight insurance, Rev. Russell decided that Mrs. Russell should have insurance to cover her during the trip. This machine dispensed Insurer's policy T-20, In many ways the T-20 affords severely limited coverage in that it provides protection only for accidents while aboard an airplane or in established limousines going to or coming from the airport. On the other hand, the T-20's coverage expressly remains in effect for the duration of the round trip or for twelve months, whichever occurs first. Similarly, since events and covered occurrences were more restrictive, the face amount of insurance per premium dollar was larger than other policies. Had a T-20 been machine-issued the Assured's death would have been covered. But no one had the proper change to operate the machine, so the Russells stepped just south of the machine to one of Insurer's staffed insurance booths. The booth had signs overhead reading 'Flight Insurance' and was attended by a Miss Fletcher.
 
 
 5
 Rev. Russell asked either for flight insurance or insurance[4] to cover his wife on her round trip to Lubbock. Miss Fletcher then asked 'How much?', meaning what amount of insurance coverage. Mrs. Russell asked for the least amount and $20,000 was the amount agreed upon. Without then explaining various policies available (see note 8 infra), Miss Fletcher took out an application form and began to fill it out. She then asked either how long would Mrs. Russell be gone or when would she be returning. Mrs. Russell turned to her husband and asked 'three days?'. Rev. Russell said she should allow hereself more than that-- at least four days. Miss Fletcher completed the form[5] and turned it around for Mrs. Russell's signature. Mrs. Russell signed and paid the $2.25 premium. Miss Fletcher stapled the policy together and handed it to Rev. Russell.
 
 
 6
 The policy purchased was not, however, the T-20; rather it was the T-18, a significantly different policy. The T-18 is a general accident policy that covers almost all risks-- whether air related or not-- during the life of the policy. The policy term is stated in terms of twenty-four hour periods on a daily basis up to thirty-one days.[6] The premium is higher on the T-18 for the same dollar amount of insurance, and the T-18 is not sold in vending machines. As the Schedule signed by Mrs. Russell shows (see note 5 supra), the T-18 was issued for only four days, and expired at 11:00 a.m., Tuesday, January 29, 1963, about twelve hours prior to the Assured's death.
 
 
 7
 The District Court credited Rev. Russell's testimony that Miss Fletcher never mentioned any other available policies,[7] did not explain the T-18, and did not warn plaintiff that the policy would expire at 11:00 a.m. on Tuesday, January 29, 1963.[8] The Judge also found that the Assured intended to buy insurance that would cover Mrs. Russell's round trip, which both she and her husband thought would occur within four days.
 
 
 8
 After buying the insurance, Mrs. Russell boarded her plane and arrived safely in Lubbock, Texas. There the funeral was delayed because a son of the deceased had not arrived from England. The funeral was finally held on Tuesday, January 29, and Mrs. Russell was fatally injured when her airplane crashed that night at 10:45 p.m. while attemting to land at the Kansas City, Missouri, airport. The insurance policy had expired by its own terms about twelve hours earlier. The Insurer denied liability.
 
 
 9
 The Assured then pursued Insurer in this diversity of citizenship suit in Kansas on the theories that either (1) the insurance contract should be construed to cover the death of Mrs. Russell, or (2) the policy should be reformed to provide coverage for the return flight from Lubbock to Kansas City. The District Judge held that the contract was clear and unambiguous and as written did not cover the accident. But now of direct importance he held that as a matter of equity the policy should be reformed to cover the accident.[9] Judgement for $20,000 was entered for the Assured. Insurer appealed contending that it is not liable since the policy had expired and the company was not guilty of any inequitable conduct that would give rise to the remedy of reformation. The Assured cross-appealed contending that the judgment should have been for $90,000, the amount of straight flight insurance (T-20) that $2.25 would have bought, but the Assured did not appeal the decision that the policy could not be construed to cover the accident. Thus the only substantive problem before us is whether the contract should, as a matter of equity, be reformed.
 
 
 10
 But before we reach the merits, with the suit being brought in a Kansas District Court by a Kansas resident on a contract made in Missouri, an Erie[10] problem of determining what state's law to apply arises. The District Court held that the Kansas conflicts rule is to apply Kansas law to this insurance policy. Insurer contends, albeit without much vigor, that Kansas follows the lex locus contractus rule and a Kansas state court would apply Missouri law.[11] Even the trial judge acknowledged that the Erie-Stentor Electric[12] lights are dim here. Although it makes little difference in this case what the Kansas conflicts rule may be since Insurer admits there is no substantial variation between the relevant Kansas and Missouri law, we hold for Kansas that in a suit such as this one, involving an adhesion insurance contract, Kansas would apply its own law to a suit brought in its court by a Kansas resident. Although this is deciding what Kansas would decide on a question they have never decided,[13] the case of Hildebrand v. Washington Nat'l Ins. Co., 155 Kan. 220, 124 P.2d 510 (1952), is inferentially controlling. In that case the conflicts problem was pleaded and argued in a suit on an insurance policy made in another state by a Kansas resident. Without discussion of the problem, the Kansas court applied Kansas law. Without further discussion we do the same.[14]
 
 
 11
 The question thus remains: What would Kansas do with this case? More specifically, can the Trial Judge's approach of a duty to explain and a failure to do so which he set forth in his opinion (see note 9 supra) in persuasive fashion be sustained? We think not.
 
 
 12
 Neither party disagrees about the general principles of equity applicable here.[15] The rub comes in the proper application of those principles to the facts of this case. Reformation is an ancient remedy used to reframe written contracts to reflect accurately the real agreement between contracting parties when, either through mutual mistake or unilateral mistake coupled with actual or equitable fraud by the other party, the writing does not embody the contract as actually made.[16]
 
 
 13
 But reformation is an extraordinary remedy, and courts exercise it with great caution. 13 Appleman, Insurance Law and Practice 7608 (1943). Even in situations where obvious mistakes have been made, courts will not rewrite the contract between the parties, but will only enforce the legal obligations of the parties according to their original agreement.[17] Strouhal v. Allied Dev. Co., 10 Cir., 1955, 220 F.2d 541; 76 C.J.S. Reformation of Instruments 18 (1952). Here, of course, the Assured does not contend that mutual mistake occurred and it is well that he does not do so for obviously the Insurer intended to sell the exact policy with the exact coverage that it did. Rather, the Assured's theory rests on another accepted reformation doctrine-- mistake by one party coupled with constructive or equitable fraud by the other.[18]
 
 
 14
 Thus the whole case boils down in reality to one question: Did Insurer have a duty to tell the Assured that several insurance policies were available and to explain fully the provisions and limitations of those policies? Without this supposed duty (and its breach) the District Judge would have had no basis for judge-reformation of the contract to conform to a regular straight flight insurance policy which Insurer was offering for sale. Rules of construction, either generally[19] or with particular reference to the liberalizing impact of traveler haste in acquiring air-flight insurance,[20] are of little help since on construction the Assured fails altogether. The problem is one of the proper scope of the doctrine of equitable fraud and the manner in which that doctrine relates to the duty of an insurer to warn the customer about what he is buying.
 
 
 15
 As in nearly all cases, an inquiry of this type involves consideration of the competing interests. On the one hand we have the right of the public to be free of fraud[21] and oppression wrought by those in a superior bargaining position. But on the other hand we are confronted with the realities of doing business, the enforcement of contracts, and instability which flows from opening up written contracts to oral accretions.
 
 
 16
 The Assured urges, and the District Court declared, that an explanation was owing. By whom was it to be given? In what form was it to be offered? Orally or in writing? If orally, how would an insurer conscious of its duty of fair dealing toward a peripatetic public in a hurry assure that an adequate, reliable statement was made? The 'explanation' would vary as work shifts changed and sales personnel rotated. They would be expansive or restrictive as the loquacious or taciturn quality of the employee predominated. If the insurer turned to a written statement, how or in what manner would it assure itself that the impatient prospect would pay any more heed to it than the terms of the policy contract? And what happens when, out of an abundance of good faith, an effort is made to explain (in nonlegalese) what a legal document prescribes? And as to either method or a mixture of both, what are the significant distinctions to be pointed out? Which ones to emphasize? To minimize? To omit? How many policies need to be explained? Just the two most common-- T-20 and T-18? Or all eleven? In the meantime what is happening to time-- that precious irreplaceable which accounts for the traveler's pressure at the airport facing either dispensing machine or an attractive sales person who may well try harder but without benefit of a legal education? The flight would either be missed or the 'offer' of flight insurance withdrawn for want of adequate time for equity's mandated 'explanation.'[22] Hardship, or what seems to be hardship, may sometimes occur if the law adheres to its long-held notions of the non-variability of written contracts. But a too-quick relaxation in the contrails of the jet age might well be worse, not better.[23]
 
 
 17
 We think that imposing a duty to offer such explanations under circumstances of this kind-- requiring as it does an effort by lay persons to interpret the legal meaning of the proposed contract as well as others available-- would be fraught with great danger to the stability of contracts. We do not think Kansas would embrace such a view and for Kansas we decline to skywrite such an Erie judgment.
 
 
 18
 The printed contract controls. There it ends.[24]
 
 
 19
 Reversed.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 This term includes Mrs. Russell and the named beneficiary Rev. Russell
 
 
 [2]
 Mutual of Omaha Insurance Company, a corporate resident of Nebraska
 
 
 [3]
 The Russell's son Richard had decided at the last moment to join his mother on the trip because Mrs. Russell was upset over the death of her brother and had never flown before
 
 
 [4]
 The testimony is conflicting as to what the exact statement was
 
 
 [5]
 The following is a reproduction of the insurance form filled out by Miss Fletcher and Mrs. Russell
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 TABLE
 
 
 [6]
 '(a) This policy is issued in consideration of the payment in advance of the premium stated in the Schedule. It takes effect on the Date and Hour stated in the Schedule, Standard Time at the Place specified in the Schedule for the policy to become effective, and expires on the same hour at the end of the number of days stated in the Schedule as Term of Coverage.'
 
 
 [7]
 Insurer sold eleven different types of insurance policies at its sales booth
 
 
 [8]
 Insurer introduced testimony to show that the basic sales procedure of its employees was to explain at least two policies, the T-18 and the T-20, and let the customer choose between them. This testimony gained credence through the introduction of figures to show that the total number of T-18 and T-20 policies sold were about equal. But on this conflicting evidence, the trial judge found that no explanation was given of the different policies, and we accept this finding as not clearly erroneous. See F.R.Civ.P. 52(a)
 On the issue of whether Miss Fletcher brought home the fact that the policy would expire at 11:00 a.m., Tuesday, January 29, 1963, the findings of the trial court are not crystal-clear. In a finding dictated into the record at the conclusion of the trial hearing, the Judge found that Miss Fletcher did state the term of the policy to be four days. But in a later formal memorandum decision, the Judge stated that 'Miss Fletcher and the plaintiff and his wife discussed a four-day period for the insurance, but Miss Fletcher did not specifically tell the plaintiff and his wife that the policy would expire at 11:00 a.m. on Tuesday, January 29, 1963.' On this record the Judge had ample basis for reconsideration and contrary to Insurer's insistence he was not bound to the earlier court-reporter recorded impression. We credit the finding that Miss Fletcher did not warn plaintiff about the expiration date at all.
 
 
 [9]
 The Judge after discussing the facts summarized above followed this reasoning:
 'Under the circumstances, the (Insurer) created a situation in which its offer consisted of more than the words of the girl at the booth. It is commonly believed that insurance at airports purports to protect a person flying on a plane. The machines, the booth (with 'Flight Insurance' on it), and the fact that Mrs. Russell was at the airport for the purpose of boarding a plane, combined to give the Russells the idea of what they were buying before they stepped up to the booth. Viewed realistically, the Russells knew the general nature of the policy to be bought before they heard the sales girl's statements. Against this background, the girl at the booth did not explain that there were two different kinds of policies, but sold the one (T-18) urged by the (Insurer). This policy purports to cover a different risk (general accident for a short term) than that covered by what is commonly understood to be flight insurance (T-20).
 'Under these circumstances, does the company have a duty to explain what is being sold, and what is available? If the duty exists, there was a violation of it here, and this violation could constitute sufficient inequity to be a basis for reformation. * * *
 'What is really involved in this situation is that the (Insurer) is in a position to know what its policies contain, and knows what the prospective buyer cannot know. The buyer can make no intelligent choice if he does not know there is a choice to be made. It is not unreasonable in this situation to hold the (Insurer) to the knowledge that the (Assured) is asking about, talking About, and eventually buying insurance for the purpose of protection while riding on a plane. If the (Insurer) wishes to sell a different policy (short-term accident, personal property theft, or whatever), it should be required to inform the buyer, who is in the position of having to take what is offered. * * *
 'I therefore find that if it wishes to sell the short-term accident policy, there is a positive duty on the (Insurer) in this situation to explain that there are two types of policies, in order that the buyer may make a choice between them. In the instant case this explanation was not given; the duty was violated.'
 
 
 [10]
 Erie R.R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188
 
 
 [11]
 Cf. Hefferlin v. Sinsinderfer, 2 Kan. 401 (1864), a non-insurance contract action in which the Kansas Supreme Court followed the traditional conflict rule of lex locus contractus
 
 
 [12]
 Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. In that case the Supreme Court held that a District Court sitting in a diversity suit must apply the conflicts of law rules that the state court would follow
 
 
 [13]
 This is a little less difficult than the problem posed in Judge Friendly's celebrated Erie comment: 'Our principal task, in this diversity of Citizenship case, is to determine what the New York courts would think the California courts would think on an issue about which neither has thought.' Nolan v. Transocean Air Lines, 2 Cir., 1960, 276 F.2d 280, 281, rev'd, 1961, 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571, on remand, 2 Cir., 290 F.2d 904
 
 
 [14]
 No case cited by Insurer shows that this court has ever really decided this question before. Thomas v. Continental Cas. Co., 10 Cir., 1955, 225 F.2d 798, involves much the same problem as the present one, but since there neither party disagreed on the applicable principles of law, no analysis of the problem was made by this Court. On the other hand, the District Judge below made an extended analysis of Kansas decisions before reaching his result. Since there are no Kansas decisions in point, we will follow his decision unless clearly convinced to the contrary. Cliborn v. Lincoln Nat'l Life Ins. Co., 10 Cir., 1964, 332 F.2d 645
 The following provision of the insurance policy should also be considered in connection with the choice-of-law problem:
 '11. Conformity with State Statutes: Any provision of this policy which, on its effective date, is in conflict with the statutes of the state in which the Insured resides on such date is hereby amended to conform to the minimum requirements of such statutes.'
 The trial judge held that the only reasonable explanation for this provision was that the parties had contracted with Kansas law being contemplated as the applicable law. Since Kansas will allow parties to contract in regard to the applicable law, see Rankin v. United Commercial Travelers, 1964, 193 Kan. 248, 392 P.2d 894, we agree that this reasoning provides a basis for holding that Kansas law is the proper law to apply.
 
 
 [15]
 And neither party disagrees that this is a case of first impression
 
 
 [16]
 Simmons Creek Coal Co. v. Doran, 1892, 142 U.S. 417, 12 S.Ct. 239, 35 L.Ed. 1063; Prudential Ins. Co. v. Strickland, 6 Cir., 1951, 187 F.2d 67; Gilbert v. Mutual Benefit Health & Acc. Ass'n, 1952, 172 Kan. 586, 241 P.2d 768; Hoxsey Hotel Co. v. Farm & Home Savings & Loan Ass'n, 1942, 349 Mo. 880, 163 S.W.2d 766; 3 Pomeroy, Equity Jurisprudence 870 (Symous ed. 1941); Restatement, Contracts 491 (1932); Covington, Reformation of Contracts of Personal Insurance, 1964 U.Ill.L.F. 548
 
 
 [17]
 The most common situation calling for reformation is where both parties commit error in embodying the final written agreement, thereby giving rise to the mutual mistake doctrine. See, e.g., Russell v. Shell Pet. Corp., 10 Cir., 1933, 66 F.2d 864; Waddle v. bird, 1927, 122 Kan. 716, 253 P. 576; 76 C.J.S. Reformation of Instruments 28 (1952)
 
 
 [18]
 See, e.g., Stern v. National City Co., D.Minn.1938, 25 F.Supp. 948; City of Clay Center v. Meyers, 1893, 52 Kan. 363, 35 P. 25
 The general definition is stated in 1 Story, Equity Jurisprudence 258 (1852):
 'By constructive frauds are meant such acts or contracts, as, although not originating in any actual evil design, or contrivance to perpetuate a positive fraud or injury upon other persons, are yet, by their tendency to deceive or mislead other persons, or to violate private or public confidence, or to impair or injure the public interests, deemed equally reprehensible with positive fraud. * * *'
 See also 37 C.J.S. Fraud 2(c) (1943).
 
 
 [19]
 Insurance contracts, because of the inequality of the bargaining position of the parties, are construed strictly against the insurer. See, Indemnity Ins. Co. v. Pioneer Valley Sav. Bank, 8 Cir., 1965, 343 F.2d 634; Prime Drilling Co. v. Standard Acc. Ins. Co., 10 Cir., 1962, 304 F.2d 221; Fidelity & Cas. Co. of New York v. Amith, 10 Cir., 1951, 189 F.2d 315; Connecticut Fire Ins. Co. v. Reliance Ins. Co., D.Kan., 1962, 208 F.Supp. 20
 
 
 [20]
 See Rosen v. Fidelity & Cas. Co., E.D.Pa., 1958, 162 F.Supp. 211. Nor does the Assured get any help from the two state cases, Stevens v. Fidelity & Cas. Co., 1962, 58 Cal.2d 862, 27 Cal. Rptr. 172, 377 P.2d 284, and Lachs v. Fidelity & Cas. Co. of New York, 1954, 306 N.Y. 357, 118 N.E.2d 555, so heavily pressed by the Assured. There courts reformed flight insurance policies which excluded coverage for flights on nonscheduled airlines operating out of the terminal where the policies were bought. We express no opinion as to the correctness of these decisions, but say only that they are not in point here. Those policies had deeply-buried provisions to deny recovery, and the policies were sold by machines set up right in front of the non-scheduled airlines' ticket counters
 
 
 [21]
 Misrepresentation and fraud in the usual sense, not present here, call for quite different considerations
 
 
 [22]
 Of course, if in answer to an inquiry by a prospect or by an affirmative statement made by the insurer's agent to the prospect it was indicated that the policy would cover the round trip, then the insurer would certainly have to give some explanatory warning before issuing a T-18 policy which is for a fixed period of time, and not written in terms of round trip
 
 
 [23]
 Consider, for example, the T-18 policy which Rev. Russell bought. Although it is a short-term policy, the coverage provisions are much broader and more inclusive than a straight flight insurance policy (the T-20). For example, if Mrs. Russell had been killed in a taxi smashup while riding to the Lubbock airport for her return flight, or had she been killed in a hotel fire while there, she would have been covered under the T-18 but not under the T-20. Would the machine-sale of a T-20 be defective for want of a warning recording that at the nearby counter, better or different coverage was available?
 
 
 [24]
 This disposition of the suit makes unnecessary any discussion of the Assured's cross-appeal in which $90,000 was claimed as the proper reformed recovery. It also renders unnecessary any discussion of Insurer's covert assertions that the Assured's proof did not rise to the necessary clear and convincing degree. See Federal Land Bank of Wichita v. Bailey, 1943, 156 Kan. 464, 134 P.2d 409