COTTONWOOD MALL SHOPPING CENTER, INC., a Utah corporation, Plaintiff and Appellant,

v.

UTAH POWER & LIGHT COMPANY, a Maine corporation, Defendant and Appellee.

UTAH POWER & LIGHT COMPANY, a Maine corporation, Third-Party Plaintiff and Appellee,

v.

Sidney M. HORMAN, Veoma H. Horman, Horman Development Company and Horman Investment Company, Third-Party Defendants and Appellants.

No. 474-69.

United States Court of Appeals, Tenth Circuit.

March 12, 1971.

Rehearing Denied May 10, 1971.

Brigham E. Roberts, Rawlings, Roberts & Black, Salt Lake City, Utah, for appellant.

Marvin J. Bertoch and Thomas A. Quinn, Salt Lake City, Utah (Ray, Quinney & Nebeker, Sidney G. Baucom and Robert Gordon, Salt Lake City, Utah, with them on the brief), for appellees.

Before LEWIS, Chief Judge, JOHN R. BROWN, Chief Judge [*], and SETH, Circuit Judge.

BROWN, Circuit Judge.

Through the wide door of a federal antitrust suit we back into an earthbound, Utah-bound *Erie* problem of statutory construction since the thrusters on the alternative due process claim cannot orbit it to a constitutional apogee. In more austere terms the question is whether a shopping center operator in supplying electricity to the lessee merchants becomes subject to regulation as a public utility. The Court below answered in the affirmative, and we affirm.

Cottonwood,[1] owner and operator of a large shopping center in the trade area of Salt Lake City sued Power Company[2] alleging that Power Company had attempted to monopolize the market for electrical power at the Center and had interfered with existing contracts of Cottonwood to provide electricity for J. C. Penney Company, a tenant on the Mall. The basic question is put in issue by the defense that Cottonwood lacks the necessary Certificate of Public Convenience from the Utah Public Service Commission and therefore cannot chal-

---

[*] Of the Fifth Circuit, sitting by designation.

1. Cottonwood Mall Shopping Center, Inc., a Utah corporation.

2. Utah Power and Light Company, a Maine corporation, having franchises and requisite certificates to furnish electricity to the public.

lenge these economic activities of Power Company.[3] The Court below gave summary judgment to Power Company on the ground that Cottonwood would need a Certificate before it could press its claims, for if it had no right to sell electricity, then by definition Power Company could not interfere with this "right."

This brings into play the Utah statutory structure of utility regulation which starts with the traditional requirement of a Certificate of Public Convenience[4] for a broad range of businesses including an "electrical corporation" which is broadly defined[5] as is "public utility"[6] generally. The decision

3. As an adjunct to this defense, Power Company sought and obtained a preliminary injunction to prevent Cottonwood from interfering with Power Company's business relationships with its customers on the Mall, one of whom was J. C. Penney Company.

4. Utah Code Annotated § 54–4–25(1) (1969 Supp.) provides that:

"No railroad corporation, street railroad corporation, aerial bucket tramway corporation, gas corporation, *electric corporation*, telephone corporation, telegraph corporation, heat corporation, automobile corporation, aircraft carrier (corporation), water corporation or sewerage corporation shall henceforth establish, or begin construction or operation of a railroad, street railroad, aerial bucket tramway, line, route, plant or system or of any extension of such railroad, street railroad, aerial bucket tramway, line, route, plant or system, without having first obtained from the commission a certificate that present or future *public convenience and necessity does or will require such construction* * * *."* (Emphasis added).

5. In Utah Code Annotated § 54–2–1 (20) (1969 Supp.) "electrical corporation" is defined:

"Every corporation, *cooperative association* and person, their lessees, trustees and receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any electric plant, or in anywise furnishing electric power, for public service *or to its consumers or members for domestic, commercial or industrial* use, within this state except where electricity is generated on or distributed by the producer through private property alone, *i. e., property not dedicated to public use,* solely for his own use or the use of his tenants, *or by an association of unit owners formed under the "condominium ownership act," chapter 111, laws of Utah, 1963 [57–8–1 to 57–8–35] and not for sale to others."*

The annotations to § 54–2–1 indicate the 1965 changes in this and other sections from their prior reading which we have indicated above by *underscoring.*

History: L.1917, ch. 47, art. 2, § 1; C.L.1917, § 4782; L.1925, ch. 12, § 1; R.S.1933 & C.1943, 76–2–1; L.1948 (1st S. S.), ch. 7, § 1; 1957, ch. 106, § 1; 1959, ch. 94, § 1; 1965, ch. 106, § 1; 1969, ch. 153, § 1.
Compiler's Notes.

The 1965 amendment inserted "cooperative association" after "corporation," "or to its consumers or members for domestic, commercial or industrial use" after "public service," "i. e., property not dedicated to public use" after "property alone" and "or by an association of unit owners formed under the 'condominium ownership act,' chapter 111, Laws of Utah, 1963" after "of his tenants" in subd. (20) and substituted "electrical corporation" for "electric corporation" after "gas corporation," inserted "or electrical corporation" after "gas corporation" and "or electricity" after "gas," and substituted "member" for "consumer" after "furnished to any" in the first and second sentences of the first paragraph and added the proviso at the end of the second paragraph of subd. (29), and made minor changes in punctuation.

6. Section 54–2–1(29) provides:
"The term 'public utility' includes every * * * gas corporation, *electrical corporation* * * * where the service is performed for, or the commodity delivered to, the public generally, or in the case of a gas corporation or *electrical corporation* where the gas *or electricity* is sold or furnished to any *member* or consumers within the state of Utah for domestic, commercial or industrial use. And whenever any * * * gas corporation, *electrical corporation* * * * performs a service for or delivers a commodity to the public, or in the case of a gas corporation *or electrical corporation* selling or furnishing gas *or electricity* to any *member* or consumers within the state of Utah, for domestic, commercial or industrial

turns on the exception whether Cottonwood distributes the electricity "[i] through private property alone, i. e., property not dedicated to public use, [ii] solely for his own use, or the use of his tenants * * *." And we zero in on factor [ii].

Cottonwood Mall is a large shopping center in the Salt Lake City trade area. The Center lies under one roof and contains a complex of stores and buildings surrounding a Mall. Cottonwood owns all of the property on the Mall as well as the parking area around the buildings except for the Eldridge Furniture Company building that Eldridge is buying from Cottonwood under a Utah Uniform Sales Agreement.[7] Except for the Eldridge building, all of the space in the Center is presently leased to about seventy tenants under written leases. The tenants share the expenses of lighting the parking lot and the exterior of the buildings, for painting the automobile parking stalls, for sweeping and cleaning the parking area, and for maintaining the green areas in the Center.

The merchants of Cottonwood Mall have organized a non-profit corporation whose purpose it is to promote business on the Mall and to determine the extra-commercial promotional activities that should be conducted there. These activities will, in the jargon of the shopping center world, generate traffic to the Center with the hope, if not expectation, that many will then or later become customers of some or all of the merchants. The Board, consisting of persons elected by the merchants (who pay substantial dues based on square footage) and of the President of Cottonwood, must approve any such outside activities on the Mall. In the past the Board has authorized a whole gamut of activities including automobile shows, small car races, sidewalk sales, garden shows, boat shows, stamp shows, Indian dances, a circus, art displays, and handicraft shows.[8] Also, the auditorium at the Center has been used by many religious, civic, social and political groups to hold gatherings, dances, and the like, a large number of which took place after store closing hours.

The controversy here arose when in 1968—seven years after the contract was made with Power Company—Cottonwood decided to furnish electrical power to the tenants on the Mall as part of a total energy plan. It constructed an energy plant just to the south of the Center and has gone through some elaborate procedures to make the system

use, for which any compensation or payment whatsoever is received, such * * * gas corporation, *electrical corporation* * * * is hereby declared to be a public utility, subject to the jurisdiction and regulation of the commission and to the provisions of this title."
The underscoring indicates the changes in this statute from the original. See note 5, *supra.* The Compiler's Notes state this as to gas:
"The 1959 amendment inserted provisions concerning selling or furnishing gas to consumers for domestic, commercial, or industrial use in subds. (18) and (29)."

7. Eldridge subleases part of its building to Morgan Jewelry Company and to Ex-Cel-Cis Beauty Salon.

8. Cottonwood's brief gives a more complete list:

"These promotions include auto shows; a small one ring traveling circus with one truckload of animals; a Gymkahana, consisting of small car races; sidewalk sales, moonlight sales, foreign car shows; Junior achievement Programs; Garden Shows; outdoor living boat shows; Go-cart Shows; Stamp Shows; Aztec Indian Dances; European Art Display; the Singing Christmas Tree; Halloween Parades; Snowmobile Shows; Ceramics Shows; Gladiola Shows; Handicraft Shows; Sports Car Shows; Home Entertainment Shows; Dolphin Shows; Outdoor living camper shows and Mobilehome Shows."
As a sure drawing card for parents, grandparents and assorted relatives, the "Singing Christmas Tree" in a recent season was used by eighty separate school children's groups.

workable. The plant,[9] as well as all ducts and wires from it to the Mall, are on contiguous private property owned by Cottonwood. Cottonwood has expended about one and one-half million dollars[10] to provide this capacity and intends to furnish the power only to itself and to the tenants of Cottonwood Mall, not to other elements of the general public.[11] The charges for the electrical power, heating and air conditioning will be included in the rental rates of the tenants.

■ We begin our analysis by recognizing that there are few if any Utah lampposts to light our *Erie* way. But as this is a case in which there is no specific "state law,"[12] we need not be dismayed since the Federal Court may look to all resources[13] including "the decisions of other states, federal decisions or the general weight of authority," the goal being "that the federal court reach the result that would probably be reached were the question to be litigated in a state court." 1 Barron and Holtzoff, Federal Practice and Procedure, § 8 at 40 (Wright ed.1961).

■ The analysis begins with the long-ago, but still pertinent, declaration of the Utah Supreme Court on the underlying policy of public utility regulation. In Gilmer v. Public Utilities Commission, 1926, 67 Utah 222, 247 P. 284, that Court pointed out that though competition was usually a desirable goal, the states had found the case to be otherwise in the public utility field. The states felt it more suitable to put these activities under closely controlled, state granted monopolies. This means that in construing these statutes—which of course expressly cover the physical operational activities of Cottonwood—we must give a liberal reading to provisions subjecting the activity to regulation while simultaneously giving a more narrow scope to the exceptions.

■ Two factors lead us to the conclusion that Utah would hold Cottonwood to be subject to regulation and hence not within the sole use of tenants' exception. The first is the historical development of the statutory structure. The second is the nature of the activities in which the beneficial use of the electric power

9. Cottonwood's facilities meet the definition of "electric plant" in § 54–2–1(19).
   "The term 'electric plant' includes all real estate and fixtures and personal property owned, controlled, operated or managed in connection with or to facilitate the production, generation, transmission, delivery or furnishing of electricity for light, heat or power, and all conduits, ducts or other devices, materials, apparatus or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power."

10. Power Company's investment in the Center runs from one-half to over one million dollars, and its annual loss of revenues will be about one-quarter of a million dollars were Cottonwood's plan to be activated.

11. Cottonwood expressly states it would not serve the Eldridge building or its occupants. (See note 7, *supra*.)

12. To paraphrase our decision in Mutual of Omaha Ins. Co. v. Russell, 10 Cir., 1968, 402 F.2d 339, cert. denied, 1969, 394 U.S. 973, 89 S.Ct. 1456, 22 L.Ed.2d

753: This "is deciding what [Utah] would decide on a question they have never decided." 402 F.2d at 343 and the appended note 13.
   "This is a little less difficult than the problem posed in Judge Friendly's celebrated Erie comment: 'Our principal task in this diversity of citizenship case, is to determine what the New York courts would think the California courts would think on an issue about which neither has thought.' Nolan v. Transocean Air Lines, 2 Cir., 1960, 276 F.2d 280, 281, rev'd. 1961, 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571, on remand, 2 Cir., 290 F.2d 904."
   See also Hopkins v. Lockheed Aircraft Corp., 5 Cir., 1968, 394 F.2d 656, 657; Martinez v. Rodriquez, 5 Cir., 1969, 410 F.2d 729, 731.

13. See Stool v. J. C. Penney Co., 5 Cir., 1968, 404 F.2d 562; Insurance Co. of North America v. English, 5 Cir., 1968, 395 F.2d 854; Stevens Industries, Inc. v. Maryland Casualty Co., 5 Cir., 1968, 391 F.2d 411, cert. denied, 1968, 392 U.S. 926, 88 S.Ct. 2285, 20 L.Ed.2d 1386.

goes way beyond that of the tenants alone.

Substantial changes have been made in the 1917 version[14] of § 54–2–1(20) as note 5, *supra* reflects. The key interpretation of this section of the statute is Garkane Power Company v. Public Service Commission, 1940, 98 Utah 466, 100 P.2d 571. Following the reasoning of State ex rel. Public Utilities Commission v. Nelson, 1925, 65 Utah 457, 238 P. 237, *Garkane* held that a public utility is a business that held itself out to serve the public generally and not one that limited its customers to a certain defined group.[15] The Court, considering whether the statute applied to electrical cooperatives that supplied electrical power to their own members only, held that the regulatory powers of the Public Service Commission did not apply to these cooperatives even though access to the cooperatives was open to almost anyone who applied and who paid a very nominal fee.

But in our *Erie* effort of divination this is of little help. First *Garkane* dealt with the "furnishing electric power for public use" section of the 1917 version of § 54–2–1(20). See note 14, *supra*. Here the controversy hinges on the exception to the statute concerning distribution "solely for his own [the distributor's] use, or the use of his tenants." Neither this part of § 54–2–1(20) nor its 1917 predecessor has ever been the subject of judicial interpretation in Utah.

Furthermore whatever light *Garkane* had cast on the legal concepts of "public" and "private" that underlie this whole area was doused by the 1956 revision (see note 5, *supra*) of the definition of "electrical corporation." First, the changes made specific reference to a "cooperative association." Next, and more significant, the restrictive notion of furnishing electric power "for public service" was greatly expanded. This was done by adopting for electricity what had been promulgated for gas in 1959 (see historical note in note 6, *supra*) to subject to regulation one "furnishing electric power, * * * to its customers or members for domestic, commercial or industrial use * * *."

At least insofar as *Garkane* tried to define what "for public service" means, the 1965 statute seems clearly to overrule it. For *Garkane* expressly dealt with a company supplying electricity "to its customers or members."[16]

But we think the legislature meant it to be more than a legislative repeal of *Garkane*. It brought gas and electricity in harmony and as reflective of a purposeful broadening of regulatory coverage, the changes were carried forward into the definition of "public utility." (See note 6, *supra*).

On the uncontradicted facts revealed by this record we think also that Utah would not consider the power furnished solely for the "use of [the] tenants." At the outset, like Mordecai at the gate, there is Eldridge and his brood of sublessees. True, Cottonwood disclaims a purpose to serve him. But Eldridge gets all the benefit from the common lighting of the interior Mall, the park-

---

14. "The term 'electrical corporation' includes every corporation and person, their lessees, trustees and receivers or trustees appointed by any court whatsoever, owning, controlling, operating or managing any electric plant, or in anywise furnishing electric power, for public use within this state except where electricity is generated on or distributed by the producer through private property alone, solely for his own use or the use of his tenants and not for sale to others."

The 1917 statute was re-enacted several times prior to 1965. Somewhere down the line, "public *service*" was substituted for "public *use*."

15. Following *Garkane* closely is San Miguel Power Association v. Public Service Commission, 1956, 4 Utah 2d 252, 292 P.2d 511.

16. The specific addition of condominiums as an exception adds weight to our conclusion. Quite apart from highly refined legalistic concepts in this modern tax-born structure, there is a considerable parallel in terms of interlocking mutual interests between condominium participants and the shopping center relationship.

ing lot and all other areas not only open to the public but to which all hope and pray the public in droves will come. Eldridge customers, both real and prospective, likewise share in the cool, regulated atmosphere which Cottonwood power turns into an air-conditioner Mall. Eldridge is a direct "user" of the only beneficial function that power can supply to these premises—light and air conditioning in the public areas. Cottonwood cannot flee the statute because it in effect gives power away to Eldridge, for the power is nonetheless "furnished."[17]

But we need not rest on this unusual fact alone. The whole activity of the merchants and operator of the Mall demonstrates that for the purposes of this utility statutory scheme, the power is not furnished "solely for the use of the tenants" (see note 5, *supra*). Not by accident, but by the sheerest deliberation, Cottonwood and the member-merchants have made others—members of the public singly or in organized groups—a principal object of the things which power supplies—light and air conditioning in the Mall and light in the parking areas. To be sure, all of this is not offered in the name of sweet charity. But at least to the extent that someone is attracted to the Center without ever making a purchase, or making a purchase from all of the contributory establishments, the beneficial enjoyment afforded is for the persons other than Cottonwood or tenants or both.

A utility structure is not based upon collateral legal concepts of property ownership. The law, as it adapts itself to the changing interests of an irrepressible society, can measure these things in a realistic way. Thus, to the great delight of promoters, entrepreneurs, mortgage lenders, building contractors and merchants, the modern shopping center is a part of the community. It seeks to seek and serve the public. And the law at appropriate times recognizes its public characteristics, whatever may be the nature of legal title.[18]

With all of these factors—(i) legislative changes bringing in the concept of furnishing electricity to consumers (ii) the presence of Eldridge and (iii) widespread direct enjoyment by the public of the power furnished on a non-remunerative basis—we do not think Utah would permit this intrusion into the field of a public utility by one who would be unregulated both from the standpoint of what it could do to its customers and, more so, the damage it could do to the public good by an uneconomic duplication of facilities and a raid on Power Company's customers to the detriment of all public power users. Nor do we think Utah would be persuaded by the cases from other states[19] which involve different statutes and much less precise policies.

17. A *sale* is not required under § 54–2–1 (20). Electricity need only be "furnished." (See note 5, *supra*). Under "public utility" coverage exists for electricity "sold or furnished." (See note 6, *supra*).

18. See Amalgamated Food Employees' Union Local 590 v. Logan Valley Plaza, Inc., 1968, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603; Diamond v. Bland, 1970, 3 Cal.3d 653, 91 Cal.Rptr. 501, 477 P.2d 733 [1970], reversing the opinion of the California Court of Appeal at 8 Cal. App.3d 58, 87 Cal.Rptr. 97. *Logan Valley* only addressed itself to speech activities that directly related to the business activities of the shopping center. The lower Court opinion in *Diamond* confirmed *Logan Valley* to its facts. The reversal by the California Supreme Court pointed out, however, that *Logan Valley* has possibly the far greater dimension that all speech activity permissible in a company town or a public park will be permissible in a large shopping center. We do not pass on any such issues, nor do we intimate any ultimate disposition of them, when or as any come before us later.

19. See, e. g., Drexelbrook Assoc. v. Pennsylvania Public Utility Comm'n., 1965, 418 Pa. 430, 212 A.2d 237; City of Sun Prairie v. Public Service Comm., 1967, 37 Wis.2d 96, 154 N.W.2d 360. These are for the most part apartment-tenant situations. They deal with the "service to the public" concept as in *Garkane* and not with the exception or the new broadened coverage of § 54–2–1(20) (see note 5, *supra*).

■ Statutory escape failing, Cottonwood naturally turns to the Constitution to assert the statute violates the due process clause of the Fourteenth Amendment. Or in more classical constitutional terms, Cottonwood claims that the State cannot by legislation subject private economic activity to public regulation.[20]

But beginning with Munn v. Illionis, 1877, 94 U.S. 113, 24 L.Ed. 77, the Courts have moved in a direction of giving the legislature almost limitless power to regulate private commercial activity. The handwriting on the wall is plain:

"The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with particular school of thought. See Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, * * *; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 * * *."

Williamson v. Lee Optical of Oklahoma, 1955, 348 U.S. 483, 488, 75 S.Ct. 461, 464–465, 99 L.Ed. 563, 572. *Nebbia* made it plain that it was the nature, and not the ownership, of the business that made it susceptible to state regulation. And to meet the due process requirement, the State must not face the heavy burden it does in First Amendment cases.

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, * * *."

*Nebbia,* 291 U.S. at 537, 54 S.Ct. at 516, 78 L.Ed. at 957.

There is little doubt that Utah has borne this burden here. At this date we feel it unnecessary to explain why a restriction of competition in the utility industry is a "proper legislative purpose." When we think of the overlapping power systems, duplicative operations, and higher consumer prices that would occur if every enterprise of this or of a related nature were not subject to state regulation, it is certain that for Utah the laws have a reasonable relationship to the end.

There it ends and so does Cottonwood's total energy plan.[21]

Affirmed.

---

20. Although not so presented here this can take a double form—(i) as Utah sees its own Constitution, the statute is an unwarranted invasion of private property, but (ii) if upheld by Utah it offends the federal constitution.

As to (i) we see no likelihood Utah would so hold. Although State ex rel. Public Utilities Commission v. Nelson, 1925, 65 Utah 457, 238 P. 237 got what some might regard as a resuscitating transfusion after the 1965 amendments (see notes 5, 6, *supra*) from Medic-Call, Inc. v. Public Service Commission, 1970, 24 Utah 2d 273, 470 P.2d 258, the narrow, limited activity there scrutinized bears no resemblance to the problem here. If it does anything it merely proves again the question-begging nature which as a "merry go round analysis," Home Insurance Co. v. Riddell, 5 Cir., 1958, 252 F.2d 1, really states the problem, not the solution. See also United States v. Stephen Brothers Line, 5 Cir., 1967, 384 F.2d 118.

Utah recognizes that a cooperative is a business "affected with a public interest," *Garkane, supra,* 100 P.2d at 574, and therefore subject to regulation under the 1965 changes.

21. Power Company concedes the preliminary injunction evaporates with this affirmance so we do not reach this point.